EDWARD DEV. TOMPKINS, INCORPORATED, *vs.* THE CITY
OF BRIDGEPORT.

Third Judicial District, New Haven, January Term, 1920.
PRENTICE, C. J., WHEELER, BEACH, GAGER and CASE, JS.

The plaintiff sought to recover damages for the defendant's alleged
wrongful termination of contracts made with the plaintiff in
May, 1916, for the construction of two bridges over the Pequonnock
River in Bridgeport, one at Grand Street and the other at East
Washington Avenue; and the main issue was whether the plaintiff's
dismissal in August, 1917, was justified or not under the terms of
the contracts. The trial court found that there were contradictions
and ambiguities in the specifications prepared by the defendant's
consulting engineer, whose headquarters were in Chicago, and
especially in the requirements to be observed by the contractor in
building the four supporting concrete piers for the Grand Street
bridge, a most important part of the undertaking; that these
inconsistencies were pointed out to the defendant's consulting
engineer, who was "the sole interpreter of the drawings and speci-
fications," and after various conferences and consultations the
plaintiff submitted a plan of its own for the pier construction; that
this plan was before the consulting engineer and the commission
which represented the city for almost a year, during which neither
of them would take the responsibility of deciding what should
be done, and that it was only after a new engineer had been called
in by the commission in the spring of 1917 to advise it, that the
plaintiff's plan, in effect, was adopted; that for these delays, which
prevented the completion of the bridge within the stipulated
period, the defendant city and not the plaintiff was responsible;
that the city, being in fault, had no right to discharge the plaintiff
and prevent it from finishing its contracts; and therefore that the
plaintiff was entitled to recover damages. Upon appeal by the
defendant it was *held:*—

1. That the court was clearly correct in its conclusion that the specifi-
cations were ambiguous and inconsistent in their requirements
touching the construction of the piers.

2. That the evidence amply sustained the finding of the trial court,
to the effect that the consulting engineer avoided the responsibility
cast upon him by the contracts of resolving the uncertainties and
inconsistencies of his own specifications.

3. That several of the defendant's assignments of error presented mere
questions of fact conclusively disposed of by the finding; that others

depended upon assumed rulings not discoverable upon the record; while still others misconstrued the true purpose of the action and the real grievance upon which the plaintiff relied.

4. That a prerequisite of the method of terminating the contract invoked by the defendant, was that it should be without fault itself, and that it clearly lacked this essential qualification.

5. That the plaintiff was entitled to show, if it could, that the defendant's unwarranted interruption of work on the East Washington Avenue bridge, in January, 1917, had retarded the fair progress of work on the Grand Street bridge, the two contracts having been made at the same time and in contemplation of their concurrent execution.

6. That evidence of delay caused by the breakage of defective concrete slabs upon their attempted removal to be placed in position, due to the faulty method prescribed by the defendant's engineer for their casting, was properly admitted in behalf of the plaintiff, since the defendant alone was answerable for such consequences.

7. That an expert engineer might testify whether the plan for constructing the piers submitted by the plaintiff was a proper method or not, and how radical modifications made by the defendant's consulting engineer affected that plan.

8. That an inquiry of the chairman of the bridge commission as to whether the commission had instigated the insertion of the provision in the specifications requiring the concrete for the piers to be laid in the dry, was properly excluded.

9. That the statement of an expert witness called by the plaintiff, as to the comparative unimportance, from an engineering standpoint, of the specification requiring the concrete for each pier to be poured in one continuous operation, was properly allowed to stand, for such light as it might give upon the contested question of ambiguities and inconsistencies in the specifications.

10. That evidence of what the city did in the way of repairing defective concrete, after taking over the work, was inadmissible; especially as the trial court allowed the witness to state exactly what the defects were, and their character and extent.

11. That there was no foundation in the record for the suggestion of the defendant that the trial court had allowed the plaintiff to recover for expenditures resulting from its own delay, and had not limited the recovery to expenditures fairly and reasonably made in the work called for by the contract; that this suggestion was based upon a misconception of the essential ground of the plaintiff's claim, which was that it had necessarily incurred expenditures while engaged in an honest attempt to carry out a contract containing inconsistencies and contradictions of the city's own making, but for which it practically declined to assume any responsibility until shortly before the plaintiff's unjustifiable dismissal.

12. That the rule of damages embraced, first, expenditures already incurred by the plaintiff in its effort to perform its agreement, and, second,. the profit it would have realized had it performed the whole contract; and that this rule was correctly applied to the situation before the court.

13. That the mere fact that the plaintiff, with knowledge of the defects and ambiguities in the plans before executing the contract, had made expenditures beyond its original estimates, did not preclude it from recovering lost profits, though it might make it more difficult to ascertain their amount.

Prospective profits are not recoverable unless they are reasonably certain to result from the breach of the contract; but mere uncertainty as to their amount may be dispelled by the same degree of proof as is required in other civil actions, that is, the amount may be determined approximately upon reasonable inferences and estimates.

Purely evidential facts, even touching recognized elements of damage, need not be detailed in a finding.

A finding that a bridge contractor spent a definite sum in preparation for its work under a contract, and in the prosecution of its work thereunder, necessarily carries with it an inference or implication that the expenditures in question were reasonably incurred for their avowed purpose.

A defendant's full responsibility for a wrongful breach of a contract is not lessened because he might have terminated the contract by legitimate methods without violating it.

Argued January 20th—decided May 14th, 1920.

ACTION to recover damages for an alleged wrongful refusal by the defendant to permit the plaintiff to fulfil its contract to build a bridge over the Pequonnock River at Grand Street in Bridgeport, and for illegally taking and retaining possession of the plaintiff's machinery and tools used by it in its work upon said bridge, brought to and tried by the Superior Court in Fairfield County, *Haines, J.;* facts found and judgment rendered for the plaintiff for $159,759, and appeal by the defendant. *No error.*

This case and the following one were tried and argued together practically as one cause.

On May 16th, 1916, the parties contracted with each other for the building of a bridge by the plaintiff over

the Pequonnock River at Grand Street in the city of Bridgeport—work to commence within fifteen days thereafter and the bridge to be completed by September 1st, 1917. The detailed plans and specifications, which form a part of the contract, were prepared by the city's consulting engineer, Joseph B. Strauss, whose business headquarters were in Chicago, Illinois, and in both their preparation and the making of the contract, the defendant was represented by a commission duly constituted for the purpose. Any dispute over the scope, meaning or requirements of the plans and specifications was referable for determination to the consulting engineer as "the sole interpreter of the drawings and specifications," and the duty of deciding questions so arising was specifically cast upon him.

The plans called for an approach to the bridge on each side of the river, and for four piers to be built in the river to support the superstructure, each to consist of two cylindrical columns of reinforced concrete of specified dimensions. In their construction, the specifications imposed these restrictions upon the contractor: (1) All forms must be pumped dry and "no concrete will be allowed to be deposited through the water"; (2) the concrete composition of each cylinder must be poured "in one continuous operation"; (3) the wooden piles on which the piers were to rest "must project six feet into the concrete at the base of the pier."

While the last of these conditions was an important one, it could not be carried out by any method of construction other than one involving the use of a coffer-dam, and borings in the river bottom at the points where the piers were to rest showed that there was no bottom hard enough at any practicable depth to resist the pressure of the water. Unless rock or some substance impervious to water was reachable at a practicable depth in driving the sheathing for the

coffer-dams, it became necessary to construct an artificial bottom or "seal," for each of them, before it was possible to pump them dry of water. The situation called for a seal of concrete ten feet thick, to meet existing conditions and permit the safe and effective pumping out of the water, and the plaintiff proposed and was ready to construct a seal of that thickness.

The necessity of supplying this artificial bottom or seal also made impossible of fulfilment the condition that all the concrete be poured in a continuous operation, and since the seal must be in place before the coffer-dam could be pumped out, it was obviously necessary to deposit the concrete composing the seal either in or through the water. The objection to so depositing concrete was that the mixture of sand, stone and cement would be more or less disintegrated by the water before reaching its resting place, and to avoid this the plaintiff proposed to use a tremie—a pipe through which the concrete is passed to its final place of deposit so that the mixture does not come in actual contact with the water until it reaches the place designed for it to lie.

The specifications were ambiguous or inconsistent in all the respects suggested, and various conferences were had between the plaintiff and the commission, and between the plaintiff and the consulting engineer, before the plaintiff submitted its plan for the construction of the piers. Such a plan was called for by the contract within ten days after its execution, but was not actually submitted until June 2d, 1916. It was followed on June 14th, 1916, by a detailed plan and sketch, submitted by the plaintiff to the consulting engineer and after examination returned by him twelve days later with his approval of the general coffer-dam method—which was in fact contemplated by his own original plans—but disapproving the precise method

submitted, and with suggestions as to the depth to which the coffer-dams should be driven, and the thickness of concrete required for the seal,—for while he conceded that a seal was necessary, he advised trying a thickness of less than ten feet. He further proposed that if the plaintiff would excavate within the coffer-dams to a depth of four feet below the designed bottom of the piers and fill in the excavation with concrete, all at its own expense, he would then permit the plaintiff to deposit on this mass two feet more of concrete as a part of the actual pier construction before pumping dry the coffer-dams. This was no less a violation of the strict requirement that the concrete composition be poured in one continuous operation, than would have been the deposit of a seal ten feet thick as the plaintiff had proposed.

While the consulting engineer's attention was called many times to the ambiguity and inconsistencies in the specifications, he refused to assume any responsibility or determine any questions arising therefrom, but referred the matter to the commission, which in turn refused either to adopt his recommendation to them that a seal of eight or ten feet be laid,—as he was "convinced that it will be necessary to place this amount of concrete in the wet,"—or to permit him to authorize that plan of construction. The commission had no engineer among its members, and its insistence that the plaintiff carry out the ambiguous and contradictory requirements of the specifications, together with the position taken by the consulting engineer on the subject of the construction of the piers, the frequent impossibility of reaching him seasonably because of his absence from Chicago, and his refusal to pass upon matters submitted for his decision until after discussion by him with the commission carried on by mail between Chicago and Bridgeport, all delayed the plaintiff with-

out fault of its own, for many months in the prosecution of its work under the contract.

Finally, early in 1917, the plaintiff, in order to solve the difficulty, offered to attempt the pumping out of a coffer-dam which it had constructed, without first sealing it, but warned the commission that the operation would endanger the workmen's lives, and that the plaintiff would assume no responsibility for the consequences. The commission then directed the plaintiff not to attempt pumping without a seal, but to await the advice of the city's advisory engineer, and Professor William H. Burr was in April, 1917, retained in that capacity, and, as to the plaintiff, represented thenceforth the "voice of the commission." He made many and radical changes in the Strauss plans which had caused the controversy and disagreement. The important requirement that the piles supporting the piers should project into the base of the concrete cylinders, was entirely done away with. This permitted the substitution for coffer-dams, of open caissons.—in the use of which the projection of the piles into the concrete was impossible,—and Professor Burr actually substituted this method of construction for the two piers nearer the center of the river which were to support the draw. The coffer-dam method was retained for the two end piers, but a seal fourteen feet thick was prescribed, the concrete composing which was to be deposited through a tremie—the method long before proposed by the plaintiff but not approved by the commission. The diameter of the piers was increased, and a required anchorage of a large mass of concrete was added for the support of the western abutment. The substitution of the open caisson method for the center piers, of course made useless all work already done on the coffer-dams for their construction; it also added the new requirement of a large amount of dredg-

ing, wholly uncalled for by the Strauss plan which it superseded. During all the time that the difficulty over the pier construction was under discussion, the plaintiff was using due and proper diligence in the prosecution of other work required by its contract.

There were other causes of delay operating in greater or less measure and through no fault of the plaintiff, to hinder and prolong its prosecution of the work. These are specified in the court's finding with a detail unnecessary to repeat here.

About August 1st, 1916, the plaintiff had begun to build the forms for casting the concrete wing-piles and slabs called for in the construction of the two approaches to the bridge. The building of the approaches and abutments was then started, and before the questions concerning the pier construction had been determined, work on the coffer-dams for the pier cylinders was started.

The substructure included a concrete abutment on each side of the river, and two parallel lines of so-called wing-piles, which made the retaining walls of the approaches and were to extend from each abutment toward the upland. The space between them was to be filled to make a roadway at grade. The contract called for the completion of the substructure by January 31st, 1917, and on that date the walls and abutment on the east side of the river were nearly completed, but no filling had been made; the west abutment was completed, and a part of the wing-piles of the western approach had been driven. Nothing more had been done on that side of the river. Sheet piling for four coffer-dams was in place, and some excavating had been done. None of the piers had been constructed.

The consulting engineer estimated the value of the work done at that time at $29,917.50, and on the 1st

of July following, the value of the work done was estimated by him at $51,015.36.

On June 15th, 1917, the resident engineer, one Bean, notified the plaintiff in writing from Bridgeport of certain claimed specific defects in its work, and requested their correction; and on August 3d, 1917, the consulting engineer, Strauss, wrote the plaintiff from Chicago, calling its attention to the Bean letter, and to certain matters "which are also of vital consequence and which should receive immediate attention." These were a failure to begin dredging for the caisson work substituted by Professor Burr, although "the site for dredging has been clear and unobstructed since July 1st"; a neglect to correct defective concrete work and to remove cracked wing-piles and slabs; a failure to maintain a suitable force of men, and a competent superintendent; a failure to drive the sheet-piling for one of the pier cylinders in "true condition," and a failure "to proceed with the work as fast as is necessary to insure the completion of the work within the time required by the contract." This was followed, on August 8th, by a written notice from the commission enclosing copies of the two communications just referred to, and notifying the plaintiff that unless it proceed within ten days to repair the imperfections in question and "to perform the work required by the notice from the consulting engineer," the city would terminate the contract, and take over the work and complete it.

Some of the matters complained of in the notices from the engineers were of minor importance, and all the work specified which in any way contributed to the completion of the bridge was started by the plaintiff upon receipt of the notice, and thereafter either kept under way or brought to completion. The requirement for dredging called for by the new substituted

plan of the advisory engineer, Professor Burr, was met by the plaintiff with such promptness as the then prevailing adverse labor and other conditions fairly permitted. The complaint that the sheet-piling of one of the coffer-dams was out of alignment, had no relation to the completion of the bridge, but dealt with one of the plaintiff's own agencies for building the piers.

On August 20th, 1917, the commission notified the plaintiff in writing that the defendant terminated the contract and would take over and complete the work, and on September 3d, 1917, forcibly ejected the plaintiff from the bridge site, took possession of all its tools, appliances and materials thereon, and retained them until October 19th, 1917.

The contract furnished four methods to the defendant for interrupting the plaintiff's work upon the bridge. That under which the defendant claimed to have acted solely in its annulment of the contract and in taking possession of the plant and equipment, is defined as follows:—

"If the consulting engineer should at any time be of opinion that the contractor is neglecting to remedy any imperfections in the work 'or to repair damage to public or private property or is not progressing with the work as fast as necessary to ensure its completion within the time as required by the agreement, or is otherwise violating any of the provisions of the contract, said engineer in behalf of the city, shall have the power and it shall be his duty to notify the contractor to remedy such imperfections, to proceed more rapidly with said work or otherwise comply with the provisions of the contract. The city if not at fault may give the contractor ten days written notice, and at the end of that time if the contractor continues to neglect the work the city may . . . terminate the employment of the contractor under this agreement and take pos-

session of the premises and of all materials, tools and appliances thereon, and employ such force as may be necessary to finish the work. In such case the contractor shall receive no further payment until the work shall be finished when if the unpaid balance that would be due under this contract exceeds the cost to the city of finishing the work, such excess shall be paid to the contractor; but if such cost exceeds such unpaid balance, the contractor shall pay the difference to the city."

The contract contained this provision: "If the contractor should be delayed in the performance of his work by any causes for which the city is responsible, . . . then the time stated in the agreement . . . shall be extended for a period equal to the time lost by reason of any and all causes aforesaid." The plaintiff had not completed the contract on September 1st, 1917, but at various times while so engaged on the work had applied to the consulting engineer for a definite extension of time for its completion because of the delays occasioned by the defendant. The contract gave the consulting engineer the right to fix such a period of extension, but every application to that end was ignored by him. The delay which chiefly contributed to the failure to finish the work within the time originally fixed, was the difficulty over the pier construction as already defined, and the responsibility for this delay, and for others referred to as bearing upon the result, and for the consequent failure to finish the bridge by September 1st, 1917, rested upon the defendant, whose claim that it was without fault was not established. Neither was it established that the plaintiff continued to neglect the work after the notices from the engineers referred to.

The net expenditures of the plaintiff in the preparation for, and prosecution of, its work under the con-

tract, amounted on September 3d, 1917, to $145,989.27. The defendant made the general claim that they were caused in part by the plaintiff's fault in its conduct of the work. No proof of any amount of loss thus incurred was made by the defendant, and the total amount of the plaintiff's expenditure was established by checks and other writings in support of the oral testimony of Mr. Tompkins, the president of the plaintiff concern. Some of the items on which the defendant's claim was made were expenses caused by inherent defects in the original plans of construction, which did not develop until the work was attempted by the plaintiff. If the plaintiff had been permitted to carry out the contract according to the terms thereof, it would have made a profit of $49,361.48. After deducting payments made to the plaintiff of $49,184.25, the net amount of the plaintiff's damages is $146,166.50, upon which interest was allowed from September 3d, 1917, to the date of the judgment.

During the trial the court ruled against the defendant upon the following offers of testimony, and an exception to each ruling was noted:—

(1) The president of the plaintiff corporation, Mr. Tompkins, testified to the concurrent execution with the contract in question, of a similar contract by the parties for the building of another bridge over the same river at East Washington Avenue, three blocks away— the plaintiff's proposal having been that the two bridges were to be constructed together. The city had terminated the East Washington Avenue bridge contract in January, 1917. A question whether the plaintiff could have used the same plant in operating both contracts together was objected to by the defendant as irrelevant, and upon its admission with an affirmative answer, the witness was asked whether the action of the city, in stopping the plaintiff from proceeding

with work on the East Washington Avenue bridge, delayed its work on the Grand Street bridge.

(2) A witness, Carey, called by the plaintiff, testified that the plaintiff was delayed in the handling of certain concrete slabs which were called for by the contract as a part of the construction work of the walls of the bridge approaches. In answer to a further question he explained that although these slabs had been cast to conform strictly to the detailed requirements of the specifications,—which included "stirrup irons" at each end of the slab, put there for apparent use in lifting the slabs,—they defectively lacked reinforcement enough to sustain their own weight when lifted for transportation, and broke under the attempt to remove them from the platform, where they were cast, to the places designed for them in the wall. The plaintiff claimed that its work was delayed by its having to make new slabs from corrected designs to replace the broken ones. The defendant's objection was that the contract concerned itself only with the sufficiency of the slabs for their final purpose, and that the defendant was not answerable for difficulties of any kind encountered by the plaintiff in moving them.

(3) A witness, Parsons, called by the plaintiff as an expert engineer, was asked whether the plan for constructing the piers, which was submitted by the plaintiff to the consulting engineer and returned by him radically modified by counter requirements of his own, was "a proper method for the building of these piers." Upon the defendant's objection that the complaint laid no foundation for the question, the plaintiff stated that its purpose was to show that the plan disclosed "a proper method, and that the modification of it was improper and unsafe, and that the contractor would not have been justified in going forward with this" modified plan. This statement was in substan-

tially the language of one paragraph of the complaint. The question was allowed.

(4) A witness, Moran, called by the plaintiff as an expert engineer, was asked "about the point of pouring concrete for the piers in one continuous operation." In the course of a long answer he characterized it as "a general provision and one which might be waived, and might be expected to be waived in case there was any real reason why it could not be done. . . . I would not consider that that specification was one which was to be taken seriously in connection with as important a matter as, for instance, the general method of doing the work." The defendant asked to have the answer stricken out, on the ground that whether the consulting engineer might or should have waived this condition "is purely a question for the court as to this contract." The motion was denied.

(5) The chairman of the bridge commission, as a witness for the defendant, was asked whether or not the commission had instructed the consulting engineer, before the plans and specifications were framed, to provide that the concrete for the piers should be laid in the dry. This was excluded upon the objection that it was not admissible either to aid in interpreting the contract, or to explain the engineer's attitude toward that requirement of the specifications in his dealing with the plaintiff.

(6) Professor Burr, the advisory engineer mentioned in the finding, was a witness for the defendant. With reference to a claimed defect in the concrete of the western abutment of the bridge, he was asked what the city did to repair it after taking over the work. This was excluded upon objection, the court remarking: "There is no objection to his stating exactly what the extent and character of the defects were. To that extent the court would admit the testimony."

The appeal assigns error (1) in finding certain facts and refusing to find others, (2) in the rulings upon evidence as set forth, (3) in ruling that the failure of the plaintiff to complete its work within the time originally demanded by the contract was due to delays for which the defendant was legally responsible, (4) in ruling that the reasons assigned by the defendant for terminating the contract were insufficient to justify its course, (5) in including certain disbursements and items of expense as proper elements of damage, and (6) in allowing anticipated profits as an element of recoverable damage.

All the evidence has been printed in support of the appeal for a correction of the finding.

*William H. Comley, Jr.*, with whom was *William Parker Seeley*, for the appellant (defendant).

*Carl Foster*, for the appellee (plaintiff).

CASE, J. So long as it remained an operative condition of the contract that the supporting piles of the piers must pierce and extend into the bases of the concrete cylinders, the contractor had little or no choice of general plans of construction; he was in any event committed to the use of coffer-dams, and this was the method contemplated from the first by the city's consulting engineer who framed the requirements of the contract. The trial court so finds, and—at least so far as the evidence enlightens us on accepted engineering processes—was bound so to find. This requirement that the ends of the piles be embedded in the piers that rested on them was confessedly insisted upon until dispensed with by the advisory engineer in the spring of 1917—nearly a year after the signing of the contract and long after a material part of the delay had been

caused. It was therefore a constantly controlling factor of the contractor's course during all the controversy over the building of the piers. Since he was restricted to the use of coffer-dams, his right to use them in the only approved way to make their agency safe, serviceable and effective for his purposes, will be implied. Neither the contract itself, nor his knowledge of the general character of the work confronting him, should be read as demanding the impossible, or as limiting him to that degree of achievement, if a meaning so repugnant to the presumed purpose and intent of the parties can be reasonably avoided. He was bound, then, to make the coffer-dams substantially watertight at their submerged ends, unless he could depend upon a river bottom hard enough to do it for him at a depth to which it was practicable to drive his sheet-piling. Until this "seal" had been provided by either the river bed or the contractor, any attempt at pumping out the water would have been wholly ineffective.

The evidence warrants not only the finding that the natural bed of the river made such an artificial sealing of the coffer-dams necessary, but that the consulting engineer conceded the necessity. The reasonableness of the plaintiff's continued insistence that safety required a concrete seal ten feet thick as against the suggestion of a thinner one by the consulting engineer, is disclosed by the latter's frank but belated admission in his letter to the commission, of December 7th, 1916. After stating that " . . . the specifications call for placing the concrete in the dry, and this was the express desire of the commission," he writes: "It was, however, made plain by me at the time"—obviously referring to the very inception of the defendant's difference with the plaintiff over the construction requirements—"that a reasonable amount of concrete would have to be placed in the bottom of the coffer-dams in

the wet in order to seal them so as to enable them to be pumped dry and the bulk of the concrete to be placed in the dry. . . . I am prepared to give my approval for the placing of approximately nine to ten feet of the concrete in the wet."

In the light of the situation which the record discloses, the necessary inferences from this are that the plan which finally enlisted the engineer's approval in December, is none other in effect than the plan which the plaintiff originally submitted to him in June, and that a virtual suspension of activity on this part of the work for the intervening six months is chargeable to his withholding an approval known by him from the first to have been both fairly demanded and fairly deserved. Nor is it disputed that for months after this long overdue recommendation, the commission refused to adopt it, and ultimately gave it only such qualified recognition as may be implied from their reference of the whole matter to Professor Burr for his opinion and determination.

Such latitude as indisputable evidence of this character left the trial court in locating a responsibility for delay arising over any dispute as to the need or required strength of an artificial seal, was further narrowed by Professor Burr's requirement of a concrete seal fourteen feet thick for each of the two end piers where the coffer-dam method of construction was retained under his substituted plan. This radical and significant change of front, coming from the "voice of the commission"—as the plaintiff had been told in advance was to be the function of Professor Burr— may properly enough have had controlling weight with the court in reaching the conclusion that the plaintiff was right in this phase of its controversy over the construction of the piers, and that the defendant was wrong. When these conditions are established as essen-

tial, the impossibility of complying with certain other requirements equally definite and positive in expression, is manifest. Since the pumping-out process could not begin until the concrete seal had been laid, at least that much of the mixture must be deposited in the water. For reasons quite as patent, the concrete could not all be poured "in one continuous operation," unless a substantial part of it be laid in the water. With such undeniably contradictory restrictions imposed upon the contractor, there was no alternative to the conclusion that the specifications were ambiguous and inconsistent in requirements materially involved in the construction of the piers.

But the contract itself anticipates the possibility of differences arising from such a cause, and provides a remedy. The consulting engineer is made the arbiter of all disputes which call in question the meaning of his specifications, and the responsibility which the duty casts upon him here is obvious. The purport of the finding is that he refused or avoided this responsibility in an emergency which plainly demanded his action for the plaintiff's enlightenment, and at its persistently urged request. There was ample evidence to sustain this part of the finding, and the conclusion that the defendant rather than the plaintiff is chargeable with delays directly due to the consulting engineer's course, seems to follow as a necessary result. With the finding of these salient and controlling facts justified, further discussion of this branch of the appeal is uncalled for. They furnish the basis for proper inferences, which, with the evidence before us, fully support the finding as it stands. *Hourigan* v. *Norwich,* 77 Conn. 358, 368, 59 Atl. 487.

While certain assignments of error challenge the correctness of the conclusion that the plaintiff has established a right to any recovery whatever, (1) some

of these present mere questions of fact conclusively disposed of by the finding, (2) others depend upon assumed rulings of the court that are not discoverable on the record, and (3) still others appear to be based upon a wrong idea of the true purpose of the action, and the real grievance upon which the plaintiff relies to maintain it.

The alleged rulings of the court as to the relative importance of the provisions for pouring the concrete in a continuous operation, and for pumping the forms dry, in view of the established conflict of these provisions with other definite requirements of the specifications, are clearly and properly dealt with by the finding. They involve questions of fact, and present no reviewable question of law. The same is true of the assignment which bases error upon the court's holding that the defendant's reasons for terminating the contract were insufficient. The facts found are conclusive of the matter and leave no room for discussion as to the possible misapplication of any legal principle. Whether the plaintiff's detailed offer to build the piers by his submitted method, was a sufficient compliance, so far as it went, with the contract, involved in every real sense the whole underlying dispute of the parties. If by the assignment of error on this feature of the case, the defendant is attacking the correctness of the court's conclusion that the plaintiff did all that was required of it in view of the attitude of the consulting engineer, a question of fact only is involved, upon which the finding is conclusive.

Under the second of the enumerated classes, an inspection of the record makes it quite clear that the trial court did not rule, as the defendant claims, that the consulting engineer had discretion to waive any of the contract provisions in favor of the contractor. The court has distinctly found as a fact, on the other hand,

that the consulting engineer had signally failed of his specific duty under the contract to resolve its manifest uncertainties and declare which of its radically contradictory provisions the plaintiff was to follow. Nor did the court rule that the defendant waived a strict compliance with its requirements for building the piers. The very kernel of the case presented by the finding is that anything approaching strict compliance with the specifications was literally impossible.

It is apparent, also, that the court did not rule, as claimed, that the defendant's refusal to permit the plaintiff to build the piers by its own proposed plan constituted "a violation by the defendant of the contract." Such weight as was given the attitude manifested by both the consulting engineer and the commission to the proposal, in determining where the ultimate responsibility for delay rested, is clearly indicated by the finding, and it does not appear that the court attached any distorted or unmerited importance to it, or gave it a significance that was not warranted in law.

Two other assignments of error seem to confuse the real nature of the plaintiff's position here, and so fall in the third of the classes referred to. These are the complaints that the court erred in not holding (1) that the contractor's inability to conform to the specifications was no excuse for his delay, and (2) that if he contracted with knowledge of defects in the specifications, a resulting delay would not excuse his failure to complete his contract within the time prescribed.

It must be borne in mind that the plaintiff is not seeking relief from responsibility for delays imposed upon it by the difficulties of fulfilling a harsh contract. If that were so, there might be room for the argument that one who contracts with open eyes is presumed to know his engagement and to have shouldered the burdens incident to its terms. But that proposition is

without special significance in this situation. The plaintiff's position is that of one who has justifiably demanded the fulfilment of a plain duty imposed upon the consulting engineer, the performance of which is of vital consequence to the plaintiff in laying out its work. If there were ambiguities or inconsistencies in the specifications, it was clearly the engineer's duty to resolve them. When the plaintiff has in good faith sought to have an obviously hopeless inconsistency in the specifications removed for the avowed purpose of promoting the progress of the work, it is manifestly not chargeable with the consequences of a delay due solely to a refusal of the engineer to meet that obligation.

The one remaining assignment of error on this part of the appeal is that the court overruled the claim that "if the city gave notice as required by the specifications to terminate the contract, the right to terminate became absolute, and the sufficiency of the reasons was not open to question in this action." The method chosen by the defendant to terminate the contract has been commented on by this court in a similar situation, and because of its harsh and arbitrary character, the necessity is pointed out for exacting of one who elects to avail himself of it, the strictest compliance with its terms. *Valente* v. *Weinberg*, 80 Conn. 134, 136, 137, 67 Atl. 369. In justification of the court's rejection of the defendant's claim, attention may be called to the initial requirement that to successfully invoke this method, one must himself be without fault under the contract. By the positive finding of the court, the defendant clearly lacked the essential most necessary to qualify it to act at all under the chosen method.

The rulings on evidence of which the appeal complains disclose no error. The question asked of the witness Tompkins was properly admitted. The rela-

tions of the parties to the two contracts were such that if, by an unwarranted interruption of work upon either, the city retarded the fair progress of work under the other, the plaintiff was entitled to the fact for what it was worth upon the material issue of delay. The admission of the testimony as to delay claimed to have been suffered by the plaintiff through the breakage of defective slabs was also correct. It was plainly within the reasonable intent of the parties that these slabs should be capable of successful removal by ordinary methods from the forms where they were cast to the places they were to occupy in the substructure of the bridge. If they failed of this test, to the plaintiff's detriment and through bad construction prescribed by the defendant, the latter is answerable for the consequences. The admission of the question asked of the expert Parsons, and the exclusion of that asked of the chairman of the bridge commission, are too clearly correct to warrant discussion. The court also properly allowed the answer of the expert Moran, to stand, for its bearing upon the comparative importance, from an engineering standpoint, of the specification requiring the concrete for each pier to be poured in one continuous operation. It involved matter of possible importance for the court in its consideration of the contested claim that the specifications were ambiguous and inconsistent in their provisions and wholly impossible of literal fulfilment. The question asked of Professor Burr was rightly excluded. The court's action in no sense restricted the fullest proper inquiry of the witness as to the nature and extent of the claimed defects, and its statement accompanying the ruling made this manifest.

The defendant complains finally, that the measure of damages was not limited to expenditures fairly and reasonably made in work called for by the contract,

and that anticipated profits were wrongly allowed. Certain assignments complain more specifically that reimbursement was improperly made for expenditures resulting from, (1) the plaintiff's own delay, (2) a delay due to change of plans, (3) an effort to overcome defects in the plans with full knowledge of which the plaintiff contracted, and (4) difficulties and delays in handling the concrete slabs and driving the wing-piles.

The four specific grounds last disclosed call for only passing comment. They seem either based upon a misconception of the essential ground of the plaintiff's claim, or to rest upon the assumed existence of facts which the defendant no doubt hoped to establish by its attempted recasting of the trial court's finding. While the case as it stands justifies no claim that the plaintiff is profiting either directly or indirectly by any delay of its own, "delay," in any event is not the direct cause of the plaintiff's expenditures, and there is no warrant for a suggestion that the court so treated the matter. The significance of "delay" in the case which the plaintiff undertook to establish, was as a controlling factor in preventing the plaintiff from fulfilling its contract. That, and the defendant's unwarranted failure to make compensating extensions of time for its unfair consequences to the plaintiff, put beyond possibility the completion of the work within the period fixed by the contract. The court has found that this was all due to such conduct of the commission and the consulting engineer as relieves the plaintiff from responsibility, and places the blame upon the defendant. It is misleading, therefore, and quite beside the point to associate these terms "delay" and "expenditure" in the suggested relation of immediate cause and effect. The fairness of the plaintiff's outlay and expense, and the question whether they were rightly included as incurred by it in an honest attempt to fulfil its agreement with

the city, depend upon other considerations of fact which the finding of the court makes conclusive. The claim that there was error in allowing expenditures caused by efforts to overcome defects in the plans, is neither quite accurately stated, nor sound in principle. The court finds that difficulties arising from this cause "did not develop till the work was attempted by the plaintiff." The inference follows that the expense was necessarily incurred in an apparently fair endeavor to meet the obligations imposed by the contract. The finding is also sufficient, in its silence, as to whether any expenditure made necessary by defective slabs or wing-piles was included in the sum awarded as damages. The court was not obliged to set up in detail these purely evidential facts, even if the matters with which they deal were recognized and included as elements of damage.

The plaintiff, with a choice of available remedies, elected to "bring his action for damages against the defendant for breaking the contract and preventing the plaintiff's performance of it." *Valente* v. *Weinberg*, 80 Conn. 134, 135, 67 Atl. 369. The rule of damages applicable to actions of this character is well settled in this jurisdiction, and is in harmony with that generally recognized elsewhere. *Valente* v. *Weinberg, supra; Warner* v. *McLay*, 92 Conn. 427, 429, 103 Atl. 113; *United States* v. *Behan*, 110 U. S. 338, 4 Sup. Ct. 81; *McConnell* v. *Corona City Water Co.*, 149 Cal. 60, 85 Pac. 929. Based upon the elementary proposition that the measure of damages for a breach of contract is the loss which the injured party has thereby sustained, the rule in its more specific application embraces the two distinct elements of (1) expenditures already incurred "towards performance," and (2) "the profits that he would realize by performing the whole contract." *United States* v. *Behan, supra.*

The trial court recognized this as the true measure, and consistently applied it in reaching the award. The defendant's objection is apparently not to the rule itself, but to a claimed erroneous and faulty application of it. We are unable to sustain this contention upon any of the grounds advanced, and for these reasons: (1) The court has explicitly found that up to the time the plaintiff was forcibly removed from the bridge site, its net expenditures "in the preparation for and the prosecution of its work under the contract," amounted to the definite sum which is used as one of the bases for the award. It was not incumbent upon the court to fortify this ultimate fact by making the supporting details of evidence a part of the finding, which as it stands satisfies every requirement of our practice in that respect. It is, moreover, a necessary inference from the statement of the facts, that the expenditures in question were reasonably incurred for their avowed purpose. Any other construction or conclusion involves the manifest absuridty of our assuming, solely from the lack of a positive finding upon the point, that the court though distinctly recognizing and applying the true rule has ignored the principle of fair and just compensation which is its obvious mainstay. Indeed, having been established as incurred during the fair progress of and in connection with the work, such items of expense were to be regarded as prima facie reasonable for their purpose. "Unless there is some artificial rule of law which has taken the place of natural justice in relation to the measure of damages, it would seem to be quite clear that the claimant ought at least to be made whole for his losses and expenditures. So far as appears, they were incurred in the fair endeavor to perform the contract which he assumed. If they were foolishly or unreasonably incurred, the government should have proven this fact. It will not be pre-

sumed." *United States* v. *Behan*, 110 U. S. 338, 344, 4 Sup. Ct. 81.

The finding makes it clear that both the parties and the trial court proceeded upon this theory of their relative responsibilities, and that the defendant was unsuccessful in any attempt to discredit the disputed items.

(2) The objection to the allowance of anticipated profits is confined to two of the numerous assignments of error on the appeal. The first of these seems to imply that the city's mere unacted-upon right under the contract to annul it upon compliance with certain conditions and in the absence of fault on the contractor's part, will of itself protect the city against a recovery for lost profits where, under avowedly different conditions, it has wrongfully terminated the contract by charging its own fault upon the contractor. There is no such qualification of the rule, and no reason for it. The essential difference between the two situations presented is in the quality of the defendant's act. Its full responsibility for a wrongful breach is not lessened because by legitimate methods it might have terminated the contract without violating it.

The other of the two assignments is that profits are not recoverable where the contractor, with knowledge of "defects and ambiguities" in the plans before executing the contract, has made expenditures "beyond his original estimates" on account of them. There is no such unyielding rule of exclusion, however difficult in practice it may sometimes be to fairly apportion lost profits under such conditions. The question is first and last one of fact, presenting greater or less obstacles according to conditions peculiar to the case in which it arises. But that damages by way of anticipated profits may be difficult of exact proof, in no degree impairs the theory upon which they are allowed, or quali-

fies the application of the rule. "The rule that damages which are uncertain or contingent cannot be recovered, does not embrace an uncertainty as to the value of the benefit or gain to be derived from the performance of the contract, but an uncertainty or contingency as to whether such gain or benefit would be derived at all. It only applies to such damages as are not the certain result of the breach, and not to such as are the certain result but uncertain in amount." *Blagen* v. *Thompson,* 23 Or. 239, 254, 31 Pac. 647, 18 L. R. A. 315. So "the profits to be realized cannot in the nature of things be proved with absolute certainty, and no greater degree of proof is required in such cases than in other civil actions." *Baltimore & O. R. Co.* v. *Stewart,* 79 Md. 487, 500, 29 Atl. 964. "Where prospective profits are not too speculative and remote, where they do arise directly and as a natural consequence out of the injury, they are always allowed as an element of damage." *McConnell* v. *Corona City Water Co.,* 149 Cal. 60, 65, 85 Pac. 929. And "though the *amount* of the profits be open to dispute or controversy, still, such profits as the evidence shows would have resulted but for the breach of the contract by the defendant, are a legitimate element of damages." *Lanahan* v. *Heaver,* 79 Md. 413, 419, 29 Atl. 1036. "They are nearly always involved in some uncertainty and contingency; usually they are to be worked out in the future, and they can be determined only approximately upon reasonable conjectures and probable estimates." *Wakeman* v. *Wheeler & Wilson Mfg. Co.,* 101 N. Y. 205, 209, 4 N. E. 264.

These extracts from well-considered cases disclose the reasonable theory which underlies the rule and governs its application. Whatever difficulties of proof the nature of such a claim involved, was a matter to be solved and disposed of in the trial court. The finding permits us no construction other than that expressed

by its unequivocal language, that "if the plaintiff had been permitted to carry out the contract according to the terms thereof he would have made a profit" of the amount awarded as damages arising from that cause. This, if the finding is to stand, is of course conclusive, and as has been said on another feature of the defendant's claims, the finding properly omits the evidential facts supporting the court's conclusion.

(3) The contract price is not expressly found by the court, but it is discoverable from the exhibits as $210,120. A claimed disparity between these figures and the relatively large sum allowed as damages is relied upon as showing extravagance and a lack of good faith attending the contractor's disbursements. The defendant urges that the alleged disproportion of the amount of the judgment to these figures of the contract, in itself establishes the claim that the plaintiff's expenditures were unreasonable, and not fairly justified by work legitimately done under the contract. The conclusion does not follow. The claim wholly disregards the prolonged controversy of the parties, the possibly controlling effect of the defendant's attitude and demands upon the plaintiff's course and conduct in an effort to fairly maintain its rights, and an ultimate solution of the whole matter by the advisory engineer which the court may well have considered to be in essential harmony with the plaintiff's consistently maintained contention from the first. If, as we must assume, the trial court found that the sums involved were spent in an honest effort by the plaintiff to perform its part of the agreement, their amount, large as it is, furnishes no obstacle to the allowance either in law or in fact. The claim is one more appropriately made in the trial court, for such weight as it might deserve in a consideration of the evidence.

The finding is, as we have intimated, sufficiently

full and definite on those features of the case neces-
sarily involved in a consideration of the question of
damages. We are also satisfied that here, as on features
of the case considered earlier in the opinion, it must
stand as warranted by the evidence.

There is no error.

In this opinion the other judges concurred, except
WHEELER, J., who dissented.