## THE SOUTHERN NEW ENGLAND CONTRACTING COMPANY *v.* STATE OF CONNECTICUT

HOUSE, C. J., SHAPIRO, LOISELLE, MACDONALD and BOGDANSKI, Js.

Argued November 8, 1973—decided January 2, 1974

*William J. White,* assistant attorney general, with whom, on the brief, were *Robert K. Killian,* attorney general, and *Gerard J. Dowling,* assistant attorney general, for the appellant-appellee (defendant).

*Robert E. Thorne,* with whom was *Louis R. Pepe,* for the appellee-appellant (plaintiff).

MacDonald, J.  The plaintiff, The Southern New England Contracting Company, by virtue of a contract dated June 26, 1964, with the state of Connecticut, acting therein by and through its commissioner of public works, was engaged as the general contractor for the construction of a new state health department laboratory building on Clinton Street in Hartford.  The plaintiff brought an action for damages it claimed to have sustained as a result of certain alleged breaches of that contract by the state and the state, in turn, counterclaimed for liquidated damages for delay in completion of the building. After a trial to the court, the issues were found for the plaintiff, in part, and for the defendant, in part. The defendant has appealed from the judgment rendered and the plaintiff has cross appealed claiming error in the court's failure to include interest on certain damages awarded to the plaintiff.

The defendant, in its appeal, has assigned as error the refusal of the trial court to find the facts set forth in forty paragraphs of its draft finding, the inclusion in the finding of ten paragraphs alleged either to be contrary to the evidence or in language

of doubtful meaning, or both, and of twenty-five "conclusions" claimed to be unsupported by subordinate facts and the law. It also assigned error in the overruling of twenty-seven claims of law. The plaintiff has responded by assigning as error in the defendant's appeal the inclusion of thirty-one paragraphs of the finding alleged to have been found without evidence or in language of doubtful meaning, the trial court's failure to find facts set forth in two paragraphs of the plaintiff's draft counterfinding, and the reaching of one conclusion claimed to be unsupported by subordinate facts. We hardly need to point out how strongly this court disfavors such an unwieldy method of presenting an appeal. *Pawlinski* v. *Allstate Ins. Co.,* 165 Conn. 1, 3, 327 A.2d 583. Furthermore, although certain additions and corrections to the finding are technically warranted,[1] as is likely to be the case in any

---

[1] Several of the defendant's requested additions actually are admitted or undisputed. For example, the fact that there was no winter weather protection other than temporary heat and a plan for keeping concrete from freezing was admitted by the plaintiff's president, as was the fact that winter protection is protection from weather when working inside a building which has no masonry around it. Each of the requested additions consisting of provisions of the contract was undisputed, as were those paragraphs describing some constituent parts of "temperature control wiring." It was admitted that the plaintiff knew that Ambrose Gates, the state's construction supervisor, had no authority to resolve disputes on his own. It was undisputed that the plaintiff had requested three extensions of time not included in the finding and that the plaintiff had subcontracted out most of the work. All of these additions are, at least arguably, material to the claims of the defendant on this appeal. The remaining requested additions either are not admitted or undisputed, implicit in the finding, immaterial, or would not directly affect the ultimate facts upon which the judgment depends, so that no further additions are warranted. *Salvatore* v. *Milicki,* 163 Conn. 275, 303 A.2d 734.

We find merit in only one of the defendant's attacks on the findings of the trial court. The paragraph of the finding stating that

litigation as factually complex as the one at bar, their effect is largely cumulative and is not dispositive of the issues on this appeal.

The defendant, to some extent, has simplified and clarified the basis of its appeal by abandoning a number of its claims and by focusing its appeal primarily upon the following three issues: (1) the responsibility for two separate periods of delay in the completion of the building, (2) the computation of damages for the delay, and (3) the question of whether the installation of certain temperature control wiring was extra work for which the plaintiff was entitled to additional compensation. For purposes of clarity, the salient facts, as determined by the finding as corrected, will be considered in relation to these issues. A review of the general facts, however, must precede any discussion of these specific issues.

The construction project began on July 8, 1964, and the contract called for it to be completed 360

---

no evidence was offered as to weather conditions during the period of construction was clearly contrary to the evidence and must be corrected. The remaining claims, that facts were found without evidence or in language of doubtful meaning, " 'amount to nothing more than a request that we accept . . . [their] version of the facts. . . .' *Broderick* v. *Shea*, [143 Conn. 590, 591, 124 A.2d 229]." *Salvatore* v. *Milicki*, supra, 278. This is particularly so in regard to those paragraphs challenged as being in language of doubtful meaning. "Such correction will rarely be made and never for the mere purpose of substituting language of counsel for that of the court." Practice Book § 628 (b).

The plaintiff's assignments of error in the defendant's appeal, with the exception of the challenge to the trial court's conclusion concerning interest on the delay damages, which will be considered in relation to the plaintiff's cross appeal, are, in the plaintiff's words, "assigned merely to make clearer the basis for the trial court's conclusions." They are, in fact, again primarily attempts to have this court accept the plaintiff's version of the facts or are immaterial, and no corrections of the finding are warranted by them.

working days later on January 12, 1966. Subsequent extensions of time granted to the plaintiff by the state increased the allotted construction time by ninety-seven working days, but completion of the project nonetheless required 171 working days more than were allowed. The plaintiff subsequently sued to recover: (1) the unpaid balance on the contract, (2) excessive deductions from the contract price for the state's deletion of certain equipment, (3) the cost of labor and materials for the installation of certain electrical temperature control wiring allegedly not included in the contract, and (4) damages for the delay in completion of the contract. The judgment rendered on the last two claims has generated the issues on this appeal.

In letting this project in 1964, the state employed the "pre-filed" bid system in that bids of the electrical, plumbing and heating subcontractors were received, opened and accepted prior to the submission of bids by interested general contractors. Each general contractor bidding was advised of the identity and contract price of the major subcontractors already accepted by the state and was obligated to incorporate the subcontractors' price into his own bid. The bidding procedure took place within the span of one month. The plans and specifications were made available on May 14, 1964, the bids of the major subcontractors opened on June 3, and the proposals of the general contractors opened on June 10. The plaintiff was selected as the general contractor and entered into the required subcontracts with the selected subcontractors.

The contract provided that certain laboratory equipment would be procured and installed by the state and was not a part of the contract work. The

plaintiff was required, however, to install electrical and plumbing lines in the concrete floors, to which this not-in-contract (hereinafter NIC) equipment would be connected by the state at a later date, and which would service such items as the electric current, hot and cold water, distilled water, compressed air, gas, and sanitary waste. The terms of the contract specifically advised the general contractor that the state would provide the shop drawings showing the intended location of this equipment so that the plaintiff could locate the required plumbing and wiring "sleeves" before pouring the concrete floors. The drawings, however, were not in existence at the time the contract was signed in June, 1964, were not available on February 3, 1965, at which time the trial court found the plaintiff was ready to pour the concrete floors, and were not actually prepared and submitted to the plaintiff until April 30, 1965, although the plaintiff had made a number of requests for the drawings, beginning as early as September 10, 1964. The trial court rejected the state's claim that the plaintiff would not have been ready to pour the concrete floors even if the NIC drawings had been available and concluded that the state's failure to provide the drawings caused a delay of three and one-half months.

The so-called temperature control wiring in this building provided the interconnection between fans, switches, and other devices and was essential to the synchronized operation of the building's heating and air conditioning system. A dispute as to the responsibility for the line voltage (120 volts or higher) portion of this wiring arose after construction began. Both the heating subcontractor and the electrical subcontractor had read their respective divi-

sions of the state's specifications (divisions 29 and 30 respectively) to exclude the line voltage temperature control wiring from the work which they were required to do. Installation of the disputed control wiring was necessary for the proper operation of the temperature control system and the plaintiff attempted to resolve the dispute by seeking a change order from the state authorizing the electrical subcontractor to do the wiring at a fair rate of compensation. The state at first agreed to such a change order, but later refused and issued a series of orders to the plaintiff to install the wiring at its own expense. The subcontractors continued to deny responsibility for the wiring and refused to do the work without a change order. The plaintiff eventually agreed to install the wiring at its own cost under protest, the building by that time being 98 percent complete, while reserving its rights to recover from the state if it ultimately were to be determined that the temperature control wiring had not been included in the contract. The trial court subsequently found that the line voltage temperature control wiring was not included in the plans, specifications or contract price, that the state had failed to take any action to resolve the impasse that had arisen from this error, and that, in addition to the labor and material costs incurred by the plaintiff in the installation of the wiring, the state's inaction had further injured the plaintiff by delaying completion of the project for four months.

The trial court awarded damages to the plaintiff for seven and one-half months, or 150 working days, of delay. The plaintiff submitted proof of its damages through the testimony of a certified public accountant, and the trial court concluded that the com-

putation of costs was in accordance with sound and recognized accounting principles and constituted an adequate satisfaction of the plaintiff's burden of proof. The trial court also found that the remaining twenty-one working days consumed above that which was authorized were not attributable to the state and awarded the state liquidated damages thereafter of $100 per day, as provided in the contract.

I

The defendant first argues that the court erred in concluding that the state's failure to provide the NIC shop drawings delayed the plaintiff's progress for three and one-half months. In this regard the trial court concluded that the concrete floors in the building could not be poured without the information contained in such drawings, that the steel erection, the placing and welding of floor decking had been substantially completed on February 3, 1965, that although there was some last minute preparatory work to do before the floors could be poured, the plaintiff had no incentive to complete this in the absence of the shop drawings, that if the plaintiff had had the NIC drawings on February 3, 1965, it could have installed the plumbing and electrical roughing and would have been ready to start pouring concrete in the first week of March, 1965, and, accordingly, that the state's failure to provide the drawings did in fact delay progress for three and one-half months. These conclusions are to be tested by the finding, as corrected. *Lipscomb* v. *Renzulli,* 159 Conn. 570, 572, 271 A.2d 327; *Brauer* v. *Freccia,* 159 Conn. 289, 293, 268 A.2d 645. They must stand unless they are legally or logically inconsistent with the facts found or unless they involve the applica-

tion of some erroneous rule of law material to the case. *Lipscomb* v. *Renzulli,* supra; *Brauer* v. *Freccia,* supra; *Johnston Jewels, Ltd.* v. *Leonard,* 156 Conn. 75, 79, 239 A.2d 500. The wisdom of these policies is pointed out with particular force by a case such as this where the factual framework is extremely complex and where, as the trial court pointed out, "there were sharp conflicts in the evidence."

The state claims that even if the NIC shop drawings had been supplied, there would have been substantially the same delay in the start and completion of the pouring of the concrete floors because of the necessity for completing certain field painting of steel columns prior to the pouring, a procedure which, according to the state, would have required winter weather protection which had not been provided as of February 3, 1965. While there are some findings of fact tending to support the defendant's position, the finding sufficiently supports the conclusions of the trial court so that we cannot say, as a matter of law, that they are legally or logically inconsistent.

The finding discloses that the state was obligated to provide the drawings by the contract and that the drawings were not in existence at the time the contract was signed in June, 1964, and were not actually delivered until April 30, 1965, despite repeated requests from the plaintiff beginning as early as September 10, 1964. It further discloses that the installation of plumbing sleeves and electrical conduits necessarily preceded the pouring of the concrete floors, and that the drawings were to indicate where the required electrical and plumbing roughing was to be located. Of even greater significance,

the court also found that the state's own construction supervisor on several occasions had acknowledged that the delay in pouring the floors was caused by the unavailability of the shop drawings, a finding which was unchallenged by the state on this appeal. The court further found as a fact that, except for certain preparatory work, the plaintiff was ready in all respects, including provisions for winter protection, to pour concrete on February 3, 1965, and could have proceeded then but for the absence of the shop drawings.[2] These findings amply justify the court's conclusions attacked by the state.

The state also asserts that the calculation of the extent of the delay, i.e., three and one-half months, was incorrect. As was pointed out by the trial court, the interdependency of this construction project makes it difficult to determine with mathematical certainty the amount of delay attributable to any particular cause. This problem is exacerbated further by the fact that the plaintiff poured some concrete out of sequence in order to avoid greater delay owing to the lack of the NIC drawings. There is

---

[2] Because of the importance of this finding we will briefly consider the state's challenge thereto. The state maintains that it was found in language of doubtful meaning for two reasons: (1) that there are different kinds of winter protection and it is not clear which type is referred to; (2) that the finding contains a self-defeating exception in that it in effect says "the work is done, except for the work that is not done." Corrections of the finding rarely will be made on the basis that a finding is in language of doubtful meaning. Practice Book § 628 (b). Here the "winter protection" referred to obviously is protection to keep concrete from freezing since it is the pouring of concrete that is in question in the paragraph. Moreover, we find nothing doubtful about the reference to preparatory work. Read alone or read in the context of the entire finding the disputed paragraph clearly stands for the proposition that the plaintiff was substantially ready to pour concrete on February 3, 1965, but that there still was some minor preparatory work to be done.

support, however, for the trial court's conclusion in the finding. The drawings were not given to the plaintiff until April 30, 1965. On June 3, 1965, the plaintiff started pouring concrete for the second floor and continued until June 17, by which time the floors were completely poured. By extrapolation from that timetable, the plaintiff, if it had had the shop drawings on February 3, could have completed the pouring in March, as opposed to late June. Thus the court's approximation of the delay is reasonable and not inconsistent either with the facts found or with logic.

## II

We turn next to the issues generated by the dispute over the line voltage temperature control wiring. The defendant, through its challenges to the court's conclusions and the overruling of its claims of law, maintains that the court erred in concluding that the disputed wiring was not included in the work to be performed by the plaintiff under the contract and that it further erred in concluding that the dispute caused a delay of about four months for which the defendant was responsible. An examination of the contract convinces us that the disputed wiring was not in fact included in its provisions. The pertinent parts of the specifications for the heating subcontractor and the electrical subcontractor, as fully set out in the footnote,[3] exclude such

[3] "Division 29 – Heating and Air Conditioning
29.07 Work Under Other Divisions
A) 2) . . . all electrical wiring unless otherwise noted.
29:42 Temperature Controls

.        .        .        .        .

B) . . . All line voltage wiring in connection with the automatic control system shall be provided and installed as specified under another section of this specification.
29:61 Electrical Work

wiring from the work of each subcontractor. Each of the subcontractors read the contract in that fashion and did not allocate anything for it in the bids. The plaintiff, required to accept the designated subcontractors, then incorporated the pre-filed bids into its own total bid, absent any provision related to the disputed wiring, which was accepted by the state.

The state nonetheless contends that the contract, read as a whole, did in fact require the plaintiff, as general contractor, to install the wiring. The state apparently takes this position despite the opinion of its own engineer, Jerome Mueller, that the wiring should have been the responsibility of the electrical subcontractor. The state's argument appears to be that since the contract contemplated a complete building and the building would not be complete without the wiring, the general contractor was re-

---

A) All electrical work for all systems shall be done under another division of the specifications.

Division 30 — Electrical

30:07 Work Excluded From This Division

.        .        .        .        .

(G) Temperature control wiring

30:15 Motor and Control Circuit Wiring

.        .        .        .        .

(E) Electrical control wiring incidental to the temperature control system shall be provided by the control subcontractor. Electric power wiring associated with the temperature control system shall be provided by the electrical sub-contractor. The electrical sub-contractor shall execute all power wiring on the line side and the load side of every disconnect switch and shall terminate power wiring at every motor and make final closing connections. The control subcontractor shall execute all control wiring interconnected with power wiring.

30:26 Heating System

.        .        .        .        .

(c) The wiring of the temperature controls are not a part of the electrical sub-contractors' work . . . ."

sponsible for the wiring whether it was included in the contract plans and specifications or not. Even if the contract were susceptible to that interpretation, to accept the state's position would fly in the face of two well-developed rules of contract law: (1) that a contract which is susceptible of two meanings must be construed against the party who drew it; *Greenwich Contracting Co.* v. *Bonwit Construction Co.,* 156 Conn. 123, 129–30, 239 A.2d 519; *Wall* v. *Wason,* 146 Conn. 32, 36, 147 A.2d 200; 17A C.J.S. 217, Contracts, § 324; and (2) that a contractor will not be responsible for loss or damage resulting from defective plans or specifications supplied by the contractee. *Tompkins, Inc.* v. *Bridgeport,* 94 Conn. 659, 110 A. 183; *Hills* v. *Farmington,* 70 Conn. 450, 453, 39 A. 795; see note, 6 A.L.R.3d 1394.

The state further argues that the plaintiff or its electrical subcontractor had a duty to seek a clarification of the specifications, maintaining that where a bidder on a public construction contract knows, or should know, of an apparent inconsistency, the bidder has a duty to seek clarification from the awarding authority prior to bidding. In light of the facts of this case, however, we cannot justifiably hold that the plaintiff "should have known" of the defect in the specifications prior to the time that it did. The system of bidding used on this project, with pre-filed bids and a relatively short bidding period, appears to be one particularly conducive to mistakes of the kind presented here. The state's architect, engineer and department of public works took nearly three years to prepare and review the plans, specifications and drawings for this job but did not discover the defect, yet the state would have us impose a duty to discover it upon the plaintiff,

who had just twenty-seven days to review the documents and was required to incorporate therein the bids of the major subcontractors.

The state also asserts that the four-month delay occasioned by the dispute was not the responsibility of the state. The period in question was between September, 1966, and January, 1967, when work on the building virtually ceased because of the dispute. The state first maintains that the court erred in concluding that the building was 98 percent complete at the time work essentially ceased because neither the electrical nor the heating subcontractor would install the wiring. This conclusion is amply supported by the finding that the state's own construction supervisor had reported the building as being 98 percent complete as early as July, 1966. It is undisputed that there were items of work which remained unfinished, but the state nowhere points to anything that would indicate that these were not minor items or that they amounted to more than 2 percent of the project. As a matter of fact, all of these items plus the disputed wiring were completed in less than two months after the impasse was broken.

The state finally argues that the court erred in overruling its claim of law that the plaintiff had a duty under the contract to proceed with the wiring upon being directed to do so by the state. In support of this proposition the state relies upon article 25 of the General Conditions of the contract.[4] This

---

[4] Article 25 of the General Conditions of the contract, added to the finding, reads, in relevant part, as follows: "In the performance of the work, the Contractor shall abide by all orders, Directions and requirements of the Public Works Commissioner, and at such time and places, by such methods and in such manner as he may require.

reliance on article 25 comports neither with the facts nor with the law applicable to such a situation. Throughout the dispute the electrical and heating subcontractors each continued to refuse to do the disputed work without a change order. The plaintiff attempted to resolve the problem by making a request for a change order from the state, and by having discussions with the subcontractors and the state, all to no avail. At one point the state agreed to a change order proposal but subsequently changed its mind.

In contrast to the plaintiff's attempts to resolve this problem, the state's only response after its inconsistent actions in regard to a change order was to order the plaintiff to install the wiring at its own cost. These facts fully justify the court's conclusion that the state failed to take any action whatsoever to resolve the impasse that had arisen. This failure to resolve the dispute imposes on the state the liability for the delay which ensued. In *Tompkins, Inc.* v. *Bridgeport,* 94 Conn. 659, 676, 110 A. 183, the contractor sued the city for damages incurred in the performance of a bridge construction contract. The contractor's progress was delayed for a year while it attempted to obtain approval of a change in defective specifications from the city's consulting engineer, who, like the commissioner of public works in the case at bar, was made the arbiter of all disputes regarding the contract. The consulting engineer took no action, but a duly constituted city commission overseeing the project ordered the plaintiff

The Public Works Commissioner shall determine the amount, quality, acceptability and fitness of all parts of the work, shall interpret the Plans, Specifications, Contract Documents and any Extra Work Orders, and shall decide all other questions in connection with the work."

to carry out the ambiguous requirements of the specifications, which it refused to do. This court said (p. 679): "If there were ambiguities or inconsistencies in the specifications, it was clearly the engineer's *duty* to resolve them. When the plaintiff has in good faith sought to have an obviously hopeless inconsistency in the specifications removed for the avowed purpose of promoting the progress of the work, it is manifestly not chargeable with the consequences of a delay due solely to a refusal of the engineer to meet that obligation." (Emphasis added.) We held that the city was liable for the delay resulting from its failure to meet its duty to resolve the subsequent dispute. In line with the reasoning in that case we conclude that the four-month period of delay was occasioned by the defect in the state's specifications and its failure to meet its duty to resolve the subsequent dispute.

### III

The state's final claims on its appeal are addressed to the computation of the damages caused by the delays discussed above. It argues that the court erred in concluding that the plaintiff's method of computing direct job costs and of computing indirect or fixed costs was proper and in overruling its claims of law pertaining thereto.

The plaintiff introduced evidence of its damages through the testimony of Peter Primason, a certified public accountant who examined the accounting books of the plaintiff and did so for the purpose of computing damages claimed by the plaintiff. Primason prepared two schedules of costs, schedule 1, which was described as "Direct Job Overhead for Entire Period of Job," and schedule 2, described as "General Overhead During Period of Job."

Schedule 1 included items which were described by Primason as overhead expenses which could be identified specifically for this project. The total of schedule 1 costs was $66,339, which computed to an average daily cost of $105.63. Schedule 2 consisted of items described as expenses of the business which are not easily allocable to any particular job. The total of such costs for all work done by the plaintiff during the applicable period was computed, and the portion of that total general overhead which could be allocated to this construction project, on the basis of its percentage of the total value of work done in that period, was then computed at $132,776. The average general overhead cost incurred by the plaintiff during the period of construction was thus $211.43 per day. The two average daily cost figures were then multiplied by the 150 days the plaintiff was delayed to arrive at the delay damages suffered by the plaintiff, a total of $47,558. The court found that the method of calculation of these costs was in accordance with sound and recognized accounting principles, and concluded that the plaintiff had adequately sustained its burden of proof regarding the damages caused by delay.

The state's primary challenge to the direct job cost (schedule 1) computation is that it includes items which it claims were not the result of the delays, i.e., were not a function of time. The state maintains that the inclusion of such items violates the basic principle that compensatory damages are for losses caused by the defendant's breach. Restatement, 1 Contracts, § 329. The court found, in this regard, that the total direct job overhead sum was primarily composed of only those overhead items which vary with time. Some of the items in-

cluded, such as heat, unquestionably did fluctuate during the construction project independently of any time factor. The question thus presented is whether the inclusion of such items, or more accurately, the inclusion of the daily average cost of such items, completely invalidates the computation.

There is no unbending rule as to the evidence by which damages are to be determined, but the object of the parties ought to be attained as nearly as possible. *Lee* v. *Harris*, 85 Conn. 212, 214, 82 A. 186. "It is incumbent upon a plaintiff in a contract action to prove his damages with all the certainty which is reasonably possible, but where exactness is not possible he is not therefore to be precluded from a recovery, and the best approximation to certainty is all that is required." *Bartolotta* v. *Calvo*, 112 Conn. 385, 395, 152 A. 306. Damages for a total delay of 150 days are involved herein. One of the actual periods of delay occurred before the scheduled completion date of the project and one after, and, as we have noted, this was a complex and interdependent project. In light of the fact that the court was unable to determine with mathematical certainty the number of days of delay caused by the acts of the defendant, the bald assertion of the state that it would have been feasible, in fact easy, to isolate those costs which would not have been incurred but for the delay seems, at best, unfounded. The very complexity of the issues of delay and damages herein emphasizes the practicality and fairness of the averaging method used. The state's unsupported assertion is insufficient to cause us to overturn the conclusion of the court that the plaintiff has met its burden of proof, a conclusion supported by the unchallenged finding of the court that the method of

computing this cost was in accordance with sound and recognized accounting principles and the inherent reasonableness of the method used in light of the facts of this case.

The state's attack on the inclusion of allocated general overhead in schedule 2 is more complex. Initially it again challenges the averaging method used by Primason and found by the court to be in accordance with sound accounting principles, a finding which, we repeat, is undisputed. We need only reiterate the reasoning we applied to schedule 1. It was enough that the court relied on evidence which showed "the extent of . . . [this item] as a matter of just and reasonable inference, although the result be only approximate." *Story Parchment Co.* v. *Paterson Parchment Paper Co.,* 282 U.S. 555, 563, 51 S. Ct. 248, 75 L. Ed. 544. While other methods of computation might have been acceptable, alternative methods of determining damages for breach of contract may be employed to meet the exigencies of any given situation. The test is the "reasonableness" of the method used. See 5 Corbin, Contracts § 1029. As we have noted, we see nothing unreasonable in using a daily average method in computing delay damages with reference to the particular situation presented here.

The state's primary challenge to the damages determined through the use of schedule 2 is that recovery for general overhead expenses is limited to "unabsorbed" costs which are not compensated for by income derived from the normal course of business. The state thus is arguing that the plaintiff must show that the overhead was, in fact, a loss not made up by other projects as well as that it was an expense related to the project in question. The

defendant cites *United Aircraft Corporation* v. *International Assn. of Machinists,* 161 Conn. 79, 100, 101, 285 A.2d 330, a case involving damages resulting from an unlawful strike and picketing, and *Kansas City Bridge Co.* v. *Kansas City Structural Steel Co.,* 317 S.W.2d 370 (Mo. Supr.), in support of this contention. Neither case persuades us of the validity of this argument. The *United Aircraft* case, supra, involved an unlawful strike and unabsorbed overhead was the relevant measure of damages for that particular situation, but that does not imply that it is the relevant measure for a building construction contract where delay damages are the issue. The *Kansas City Bridge* case, supra, does, in fact, state the principle asserted by the defendant, but it is an isolated exception to the general rule in such cases and not one which we are inclined to follow. "The usual rule in allowing allocated overhead expenses for delays resulting from a breach of contract is found in *Brand Inv. Co.* v. *United States,* 58 F. Supp. 749, 751 . . . [102 Ct. Cl. 40, cert. denied, 324 U.S. 850, 65 S. Ct. 684, 89 L. Ed. 1410]. 'We are allowing the plaintiff a proportionate part of its main office overhead. While such an element of damage can never be proved with mathematical precision, it is *standard accounting practice* to attribute main office expense to various company operations on some fair basis.' " (Emphasis added.) *General Ins. Co. of America* v. *Hercules Construction Co.,* 385 F.2d 13, 23 (8th Cir.). "Home office overhead is a well-recognized item of damage for delay and plaintiff would be entitled to recover it." *Luria Bros. & Co., Inc.* v. *United States,* 369 F.2d 701, 709, 177 Ct. Cl. 676. We find no merit to the defendant's challenges to the computation of delay damages.

## IV

The plaintiff, in its cross appeal, has assigned as error three conclusions of the trial court, the substance of which was that the delay damages of the plaintiff were not ascertainable by due inquiry on March 1, 1967, when the plaintiff should have been paid, and could be determined only after a judicial inquiry, and the overruling of its claim of law that it was entitled to interest on said damages from March 1, 1967.

This court recently had occasion to examine the issue of the awarding of interest in contract actions. " ' "The determination of whether or not interest is to be recognized as a proper element of damage, is one to be made in view of the demands of justice rather than through the application of any arbitrary rule." *Bernhard* v. *Rochester German Ins. Co.*, 79 Conn. 388, 398, 65 A. 134. The real question in each case is whether the detention of the money is or is not wrongful under the circumstances.' *Cecio Bros., Inc.* v. *Feldmann*, 161 Conn. 265, 275, 287 A.2d 374; *Wells Laundry & Linen Supply Co.* v. *Acme Fast Freight, Inc.*, 138 Conn. 458, 463, 85 A.2d 907; *Campbell* v. *Rockefeller*, 134 Conn. 585, 591, 59 A.2d 524. Basically, the question is whether the interests of justice require the allowance of interest as damages for the loss of use of money. *Goldman* v. *Coppola*, 149 Conn. 317, 328, 179 A.2d 817; *Wells Laundry & Linen Supply Co.* v. *Acme Fast Freight, Inc.*, supra. Whether a sum in certain circumstances has been liquidated may, of course, be a useful although not necessarily controlling criterion. *Capitol City Lumber Co.* v. *Sudarsky*, 95 Conn. 336, 340–41, 111 A. 349; 22 Am. Jur. 2d 256, 263, Damages, §§ 179, 185; cf. *Loomis* v. *Gillett*, 75 Conn. 298, 300–1, 53 A. 581.

The allowance of interest as an element of damages is, thus, primarily an equitable determination and a matter lying within the discretion of the trial court." *Bertozzi* v. *McCarthy,* 164 Conn. 463, 466, 323 A.2d 553.

In the circumstances of the present case, it cannot be said that the trial court abused that discretion. The finding clearly supports the court's conclusion that the sum due could not have been determined by due inquiry and investigation on March 1, 1967. Even after a long trial where a great deal of evidence was introduced, the court found that it was impossible to compute with certainty the number of days of delay caused by the acts of the state or the specific reasons why the plaintiff caused the remaining delay. Both liability and damages were hotly disputed, a factor which, while not decisive, can be considered, and issues eventually were determined for both parties. In such a case the trial court obviously was within the scope of its discretion in not awarding interest on the delay damages.

There is no error.

In this opinion the other judges concurred.