[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE APPLICATIONS TO VACATE AND TO CONFIRMAN ARBITRATION AWARD
The plaintiff brings this application to vacate an award of the American Arbitration Association ("AAA"), ordering the City of Hartford ("City") to restore the health insurance plan, in effect on June 30, 1991, to the members of the Hartford Firefighters Union ("Union") and to pay a damage award in excess of $6.5 million dollars to the Union. Because the arbitrator exceeded her powers or so imperfectly executed them that a CT Page 6989 mutual, final and definite award has not been issued; that the award does not draw its essence from the collective bargaining agreement for July 1, 1987 to July 1, 1991 (Agreement); and the award violate public policy.
The defendant applies to confirm the award.
Facts
The City and the Union were parties to the agreement which provided certain health benefits for members of the Union, including a basic indemnity plan, major medical, dental and other benefits. It appears that the Agreement was extended by virtue of Section 7.4 which provides that the Agreement should continue unless amended or terminated. The parties have presented this matter as though the agreement continued.
The major medical portion of the insurance did not specify a health insurance carrier as did the indemnity and dental plans, but prior to July 1, 1991 the major medical was provided by the Travelers Insurance Company.
The agreement, Article III, Section 3.5.6, provided for the substitution of the health insurance carrier(s). Specifically, Section 3.5.6 (Attachment C) provided:
 6. Substitute Health Insurance Carrier. The City may provide health insurance benefits for employees and their enrolled dependents, by other than the named insurance carriers provided:
 a. The plans proposed as a substitute contain at least equal or better coverage, benefits (including the FULL PAYMENT for participating physicians feature of the present plan), portability and administration as the present plan(s) (including payment by carrier rather than an employee to the extent that payment by carrier is currently made by carrier), at no additional cost to the employee or his or her enrolled dependents. Such substitute plan(s) must be subject to the rules and regulations of the State Insurance Commissioner's Office and shall not preclude an employee or his or her enrolled dependents from selecting the doctor or CT Page 6990 type of doctor of their choice and/or choosing the medical center, facility or hospital of their choice in order to undergo elective surgery or other medical treatment, to the extent provided under current plans.
 b. The Union shall have an opportunity to study the proposed plan(s) for a period of eighty (80) consecutive calendar days prior to implementation.
 c. If at the end of the eight (80) consecutive calendar day study period `there is disagreement between the parties on whether or not the plan(s) meet any of the criteria of subsection (a) above, then the issue will be submitted to the American Arbitration Association. The parties will request the appointment of an arbitrator with expertise in the health insurance Fields in accordance with the rules and regulations of the American Arbitration Association. If the Arbitrator rules that the City's proposed substitute carrier's plan(s) meets the criteria as outlined in #6 a, b and c of the section and the City changes carriers, the standards outlined in #6, a, b and c of this section, must be maintained during the life of the Agreement. If the Arbitrator rules that the City's proposed substitute carrier's plan(s) does not meet the criteria as outlined in #6, a b and c of this section, and the substitute carrier plan has not been implemented, the present plan(s) will remain in effect for the life of the Agreement. If the substitute carrier plan has been implemented, the old plan shall be re-established immediately and remain in effect for the life of the Agreement.
 The cost of AAA shall be split equally between the parties and the award will be final and binding.
 d. The City may make only one such proposal during the life of the Agreement.
The City, in 1991 in an effort to control employee health insurance costs, determined that the health benefits provided to CT Page 6991 all its employees, including member of the firefighters union, would be provided through a self-funded consolidated plan administered by Blue Cross/Blue Shield.
On May 16, 1991 a letter was sent to Rudolph Fiorillo, Jr., the Union's President, stating that effective July 1, 1991 the major medical plan would no longer be provided by the Travelers, but would be provided through Blue Cross/Blue Shield, which already provided the basic indemnity and dental plans. The letter stated that under Blue Cross/Blue Shield the major medical benefits would be the same as those provided under the Travelers with the additional benefit of automatic filing of major medical claims resulting from the transfer to Blue Cross/Blue Shield. The City informed the Union that there would be no change in the level of benefits, simply in the method of funding.
The Union President received this letter on June 10, 1991 and wrote to City Manager Eugene Shipman on June 12, 1991, noting that he had just received a copy of the May 16, 1991 letter which was mailed to the Union's old address. In this letter he inquired if the City intended to "self-insure our medical insurance or portions thereof" and requested to negotiate over the change in the insurance carriers.
On July 1, 1991 the City instituted a self-insurance program for the provision of health benefits for all its employees. This was funded by the City and administered by Blue Cross/Blue Shield under an administrative services only (ASO) agreement.
On June 19, 1991 the Union filed a first step grievance in connection with the adoption of the self-funded health benefits. The grievance was denied at the first and second steps of the grievance process. The Personnel Director, at the second step hearing, found that there had been no violation of Article III, Section 3.5 or 3.5.6 where Blue Cross/Blue Shield was already a named insurance carrier and the self funding mechanism did not violate the agreement. Following the decision of the Personnel Director, the Union filed for arbitration with AAA.
The parties stipulated to the following issue:
 Did the City violate its collective bargaining agreement with Local 760 when it became "self-insured" on July 1, 1991? If so, what shall be the remedy? CT Page 6992
Hearings were held before Tia Schneider Denenberg (Arbitrator) on November 5, 1991, December 3, 13 and 16, 1993, January 5 and 10, 1994. After the hearings, the City and the Union filed briefs and the record was closed on April 28, 1994. On November 2, 1995 an agreement was reached to bifurcate the award, by rendering an award on first the merits as to whether the collective bargaining agreement had been violated and then an award on the remedy, separately.
The arbitrator, issued an award on the merits on December 13, 1995 stating:
 The City violated the collective bargaining agreement with Local 760 when it became "self-insured" on July 1, 1991. In accordance with the parties November 2 stipulation, the arbitrator retains jurisdiction in the matter of the remedy.
In deciding for the Union on the merits, the arbitrator found that,
 In this instance, the employers' quest for efficiency had to comport with a collective bargaining agreement that permits changing carriers when the substitute plan offers "at least equal or better coverage" and is "subject to the rules and regulations of the State Insurance Commissioners Office" (Article III, Section 3.5.6). Based on the complete record, it is clear that the City failed the second part of that test at least, in changing its health care arrangements in July, 1991.
Arbitrator went on in her opinion to state that the diminution in benefit, to the extent that it exists, is occasioned by the loss of the "state policing of the plan." The Union did not present any evidence that any firefighter had been denied access to the Insurance Commission, nor was there any evidence of benefit claims that had been improperly denied. The Union presented only one example, disputed by the City, of a firefighter who received different coverage for his child's surgery after the funding change.
Following the December 13, 1995 award on the merits, the parties met with the arbitrator to discuss the remedy resulting CT Page 6993 from the violation of the agreement. On March 1, 1996 the arbitrator issued her remedy as follows:
The arbitrator held on December 13, 1995 that the City violated the collective bargaining agreement with Local 760 when it became "self-insured" on July 1, 1991. In accordance with the parties' November 2 stipulation, the arbitrator issues the following remedy:
1. The City shall restore the health plans that were in effect on June 30, 1991 or, if such plans are no longer available, implement fully insured plans that provide equivalent or better benefits and coverage.
2. The City shall deposit in a special escrow account, maintained by Local 760 and subject to an independent audit, the sum of $1.3 million dollars for each twelve-month period (prorated) subsequent to July 1, 1991, during which the health benefit plans unilaterally implemented by the City remains in effect. After deducting its costs, including reasonable attorney's fees and expert fees, Local 760 shall divide the funds among its bargaining unit members, retirees and survivors in proportion to the period of time each has been subject to the health plans since the changeover in 1991.
In justifying the remedy award, the arbitrator stated, "[M]erely restoring the plan in effect before July, 1991," would be inadequate; the contract language that refers to reestablishing the old plan in cases of disagreement (Article III, Section 3.5 Paragraph 6) pertains only to substitution of carriers, not a move to self-insurance, and presumes that the Union has been afforded the 80 day study period.
Law
I. Liability
This court cannot find that the arbitrator's award in regard to liability was violative of her duties.
The applicant refers to the contract Section 3.5.6 that allows, under certain conditions, changes in the health insurer carrier. The arbitrator could easily find that the remedy provided for violations of that section as set out in the last sentence of § 3.5.6(c) was inapplicable because the change CT Page 6994 contemplated was to an insurance company. This can be derived from the agreement's continued use of the words "insurer" and "carrier". After July 1, 1991 there was no insurance company; no carrier and no insured. This part of the award was within the submission.
Remedy
 II.
A. Restoration
In regard to the restoration part of the remedy there does not appear to be any improper exercise of the arbitrator's duties. Her remedy award number 1 is very close to what plaintiff claims the sole remedy should be under § 3.5.6(c) of the agreement and is in accord with the submission.
B. Damages
In regard to the damages this court has no evidence that the arbitrator knew the number of union members at any time from July 1, 1991 to the date of the award. Nor, can it find that the arbitrator had a basis for finding such numbers. In addition there is nothing in the record to show that the arbitrator ever considered the loss to the union members, individually or collectively, as a result of City's violation.
In awarding damages the general rule in Connecticut for many years has been "that the award of damages is designed to place the injured party, so far as can be done by money, in the same position as he would have been in had the contract been performed." Lar-Rob Bus Corporation v. Fairfield, 170 Conn. 397,405.
The arbitrator could not find a loss to a union member save possibly one and thus had no basis for a monetary award.
Damages must be based on evidence. Slattery v. Maykut,176 Conn. 147, 151. Although damages may be based on reasonable and probable estimates still they must be based on evidence.Bertozzi v. McCarthy, 164 Conn. 463, 468. This is true of contract claims and also requires that the damages awarded are those caused by the breach. Southern New England Contracting Co.v. State, 165 Conn. 644, 661.[1] The arbitrator had no evidence CT Page 6995 of such causation here.
"It is incumbent upon a plaintiff in a contract action to prove his damages with all the certainty which is reasonably possible, but where exactness is not possible he is not therefore, precluded from a recovery, and the best approximation to certainty is all that is required." Id. 661.
According to the arbitrator, "The only fixed, readily ascertainable point on the horizon is the amount the City saved each year by changing medical plans. . . . Those savings are the fruits of the contract violation." That was the basis of her award.
The arbitrator also said that the "remedy is based on the credible record before the arbitrator and premised on the assumption that the union is entitled to be made whole for the contract violations."
The arbitrator relied heavily on an expert, Dr. Joseph Fields, and she determined that the "coverage" that union members had after July 1, 1991 was less than the coverage provided before that date. She candidly stated that there is "no practical method to determine the precise economic value of the decreases" in coverage. The City offered to give the members six months to prove their individual losses but the arbitrator found "that would place an unfair onus on employers to document losses." In fact that is what the second part of the award hearing was for — to prove or document losses.
It is true that the arbitrator recognized that one of City's contentions was,
 "The city has instructed BCBS as administrator to provide benefits comparable to those previously provided by Travelers. When there is a difference between Travelers' past practice and the current plan, the employee always receives the higher benefit."
However, she did not have to accept that as evidence.
"The measure of damages of the individual [members] . . . would have been the difference between" the care and the cost of care they had been receiving and those to which they would have CT Page 6996 received had there been no breach. Unity Lodge v.Niles-Bement-Pond Co., 141 Conn. 499, 508. If that sum either could not be determined or was not determined the loss to the members could not be measured. Id. 508-509.
III Punishment
Obviously the award is not for nominal damages for breach of contract.
The submission is in regard to the City's violation of the agreement by becoming "self-insured." Nothing is said in the submission about wilfulness, callousness or deliberate injury to the union or its members.
The arbitrator made it clear that the award is to be a "make-whole remedy in the absence of any precise measure of the past, present or future consequence."
The Agreement does not authorize an arbitrator's award of punitive damages and there is no evidence of any cognizable loss to any union member as a result of the breach. Thus there is no rational explanation of the award other than it is punitive.Safeway Stores v. Intern. Association of Machinests. Inc., 534, F. Supp. 638 (1982); Baltimore Regional Joint v. WebsterClothes, 596 F.2d 85 (1979).
The arbitrator had neither authority nor jurisdiction to make this monetary award. She had no basis for it.
Application to vacate granted. Application to confirm denied.
N. O'Neill, J.