MARINE COLLOIDS, INC.

v.

M. D. HARDY, INC.

Supreme Judicial Court of Maine.

Argued June 11, 1981.

Decided Aug. 10, 1981.

---

Phillip E. Johnson (orally), Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Augusta, for plaintiff.

Frank G. Chapman (orally), Locke, Campbell & Chapman, Augusta, for defendant.

Before WERNICK, GODFREY, ROBERTS, and CARTER, JJ., and DUFRESNE, A.R.J.

GODFREY, Justice.

Plaintiff Marine Colloids, Inc. appeals from a judgment of the Superior Court in favor of the defendant, M. D. Hardy, Inc., in an action arising from a contract to construct a firewall. The Superior Court based its judgment on a referee's report which absolved Hardy of all liability for negligence or breach of warranty. On appeal Marine Colloids argues that the referee erred as a matter of law in concluding that because Hardy followed Marine Colloids' specifications for the construction of the firewall, Hardy could not be liable for damages resulting from the firewall's collapse. We affirm the judgment below.

On February 7, 1977, Marine Colloids filed in Superior Court a complaint against M. D. Hardy, Inc., a construction firm. The complaint alleged that Marine Colloids, a seaweed processor, had retained Hardy to design and construct a firewall for one of Marine Colloids' buildings; that because Hardy held itself out to the public as knowledgeable and experienced in construction work while Marine Colloids lacked any special expertise in that area, Hardy assumed a duty of care in designing and constructing the firewall; that Hardy breached that duty by designing and constructing a firewall that "violated widely accepted standards of engineering practice." Furthermore, the complaint alleged that Hardy breached its express or implied warranties that the firewall would be constructed in a workmanlike manner, that the materials used in the firewall would be reasonably suited for their use, and that the design of the firewall would "conform to all reasonable standards and practices of the construction trade." As a proximate result of Hardy's negligence and breach of warranties, Marine Colloids claimed, the firewall collapsed during a storm and damaged certain buildings and equipment owned by Marine Colloids.

Hardy's answer denied all Marine Colloids' allegations concerning its liability.

A hearing in the matter, held before a referee, began on January 21, 1980. During five days of testimony the following evidence was presented which, if believed, would have tended to exonerate Hardy from any liability to Marine Colloids:

On November 22, 1974, Marine Colloids sent to three contractors, including Hardy, a request for the submission of bids on a construction project. Among other aspects of the project, Marine Colloids sought estimates of the cost of building a large metal-clad building with an accompanying firewall, plus a slab foundation for the future expansion of an existing building known as the "Pilot Plant." The description of the firewall in the bid request read in its entirety:

Firewall.

A firewall is to be constructed at the north end adjacent to the slab area described under Item 1. The wall is to be constructed of 12″ block construction for a two hour fire rating. The top edge of

the structure is to be concrete capped, with a 22 GA galvanized iron flashing covering this concrete. The firewall will be flashed to the building at both side walls and roof.

A sleeve of 12″ channel shall be set in the wall to allow access of necessary service piping, etc. and will receive a plate assembly on each side of the block wall, filled with insulation. A design of the holes for the two plates will be provided the contractor at a later date.

This firewall must meet with approval of Factory Mutual or equivalent representative agency.

Accompanying the bid request was a drawing of the entire proposed project. If a contractor's bid were accepted by Marine Colloids, that contractor was obliged under the terms of the bid request to "guarantee soundness of construction for a minimum period to be specified as one year from completion of the contract."

Malcolm Hardy, President of M. D. Hardy, Inc., and William Greet, the Special Projects Engineer for Marine Colloids, had met two days before the bid request was drafted. At that meeting Greet had explained the scope and purpose of the proposed construction project and also many specific dimensions of the works to be built. Such pre-bid consultation was natural, for Hardy had earlier built several structures for Marine Colloids and had willingly made himself available to answer the company's questions. Hardy was not employed by Marine Colloids as a consultant, however, but maintained contact with Marine Colloids merely as a matter of courtesy to a good customer.

During their meeting, Greet had told Hardy that the firewall must be built of twelve-inch concrete blocks, extend two feet beyond the walls and eaves of the building, and be able to restrain a fire for a minimum of two hours. Thus, Greet had already defined the height and width of the wall and the basic materials of which it would be constructed. Although Hardy inferred that further design of the firewall might be necessary, he assumed that Ma-

rine Colloids would make design alterations through subsequent change orders issued to the contractor. Furthermore, Hardy was not too concerned about the stability of the firewall inasmuch as the project called for the ultimate erection of buildings abutting the wall on either side. As far as Hardy knew, the contractor was required to build only a free-standing curtain wall that would stand between two buildings without being bonded to them; he was not asked to construct either a weight-bearing wall or an end wall that would be exposed to the elements.

The bid request was sent to M. D. Hardy, Inc. and to two other construction firms. Hardy was the low bidder, but the bids from the other two firms on the firewall were so similar to Hardy's as to indicate that all three firms had the same understanding of how the firewall was to be built. Marine Colloids accepted Hardy's bid and included in its acceptance the following language: "Above construction to be all as per W. E. Greet specifications and dwgs. by M. D. Hardy, Co." Hardy had drafted certain drawings of the projected construction, but those drawings only followed specifications and plans that had already been created by Greet.

When Greet attempted to secure a building permit for the project, the Building Inspector for the City of Rockland informed him that the Rockland Building Code required firewalls of the proposed height to be at least sixteen inches thick. At Marine Colloids' request, Hardy submitted an estimate of the cost occasioned by expanding the firewall's thickness from twelve to sixteen inches. Marine Colloids accepted the proposal and authorized Hardy to construct the wall at the revised thickness.

In accordance with Marine Colloids' specifications Hardy erected the metal-clad building, constructed the firewall, and poured the foundation for the Pilot Plant expansion. Hardy completed the firewall on July 9, 1975. One day later, Marine Colloids told Hardy that the Pilot Plant expansion was to be held in abeyance indefinitely. In the fall of 1975 Greet communi-

cated to Hardy his concern that the firewall might not be stable in the absence of the abutting Pilot Plant expansion. After examining the firewall in Greet's presence, Hardy told Greet that he had no confidence in the firewall's ability to serve as an exposed end wall rather than as an interior curtain wall.

The firewall stood for nearly seven months, exposed on the northern end of the metal-clad building. On February 2, 1976, during a winter storm, the firewall fractured horizontally and fell to the north, damaging the existing Pilot Plant and other property. At the time the wall collapsed, winds had been sweeping across the roof of the metal-clad building from south to north at speeds of up to 70 knots. According to engineer Paul Atwood, the peculiar configuration of the buildings caused a wind tunnel to form between the metal-clad building and the Pilot Plant, in turn subjecting the firewall to intense forces of suction. Atwood testified that the wall was properly constructed for use as a firewall and that it collapsed only because of the effect of the wind tunnel—a phenomenon that would not have occurred had the Pilot Plant been expanded as originally planned.

The referee found Hardy to be free from any liability to Marine Colloids for damage caused by the collapse of the firewall. In the referee's view, Marine Colloids had originally planned to construct the metal-clad building and to expand the Pilot Plant so that there would be two abutting structures having a common roofline but divided by the firewall. Because the firewall was designed to prevent each structure from a fire in the other, it would have been senseless for Marine Colloids to build the firewall without intending to expand the Pilot Plant within a reasonable time. Marine Colloids' description of the firewall in its bid request led all the bidders reasonably to believe that the firewall was to serve as an interior curtain wall rather than an exposed end wall. Only after Hardy had completed the firewall did it learn that the Pilot Plant would not be expanded. Therefore, the referee found Marine colloids' decision not to expand the Pilot Plant left the firewall "to

stand exposed and unsupported on its north side and serving the purpose of an exterior end wall rather than the purpose of a firewall for which it was designed and built." Even after Hardy and Greet had expressed their misgivings about the stability of the wall, Marine Colloids made no effort to avoid the risk of the wall's collapsing. The referee accepted Paul Atwood's opinion that the firewall collapsed not because of any flaw in Hardy's construction but because of a wind tunnel that would have been precluded if the Pilot Plant had been expanded within a reasonable time. In conclusion, the referee ruled that Marine Colloids' damage was caused by its own decision to put the firewall to a use for which it was not designed and which was not contemplated by the parties either when they entered into their contract or while the wall was being built.

Hardy moved the Superior Court to accept the referee's report and to enter judgment in accordance with it. Marine Colloids filed a series of objections to the report, challenging the referee's factual findings and legal conclusions. The Superior Court accepted the referee's report and entered judgment in favor of Hardy.

On appeal, Marine Colloids argues that the referee erred in concluding that its damages were caused solely by its own decision not to expand the Pilot Plant. While recognizing the general principle that a contractor may not be held liable to the owner for damage caused by defects in plans and specifications furnished by the owner, Marine Colloids contends that the general principle is inapplicable to the present case. First, Marine Colloids asserts that it was relying on Hardy to design a stable firewall, so that the absence of structural features that would have prevented the firewall from collapsing was attributable to Hardy. Second, even if Hardy constructed a wall that was adequate for use as an interior firewall, Marine Colloids contends that Hardy should have provided for the fact that the firewall might have to function as an exterior end wall if the Pilot Plant were not expanded; that once Hardy

learned the Pilot Plant expansion was to be held in indefinite abeyance, he was legally obligated to reinforce the firewall so as to ensure its stability as an end wall. We disagree.

Marine Colloids rightly concedes the general rule that a contractor who completes a construction project in a workmanlike manner and in strict compliance with plans furnished by the owner may not be held liable for damages resulting from defects in the owner's specifications. *E.g., United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918); *Kubby v. Crescent Steel*, 105 Ariz. 459, 466 P.2d 753 (1970); *Sunbeam Constr. Co. v. Fisci*, 2 Cal.App.3d 181, 82 Cal.Rptr. 446 (1969); *Southern New England Contracting Co. v. State*, 165 Conn. 644, 345 A.2d 550 (1974); *St. Joseph Hospital v. Corbetta Constr. Co.*, 21 Ill.App.3d 925, 316 N.E.2d 51 (1974); *Teufel v. Wienir*, 68 Wash.2d 31, 411 P.2d 151 (1966). *See generally* Annot., 6 A.L.R.3d 1394 (1966 & Supp. 1980). Whether the contractor has skillfully complied with the owner's specifications, and whether those specifications are defective, are questions for the factfinder. In the present case the relevant facts were first found by the referee and then adopted by the Superior Court. Accordingly, the referee's findings of fact must be upheld if supported by competent evidence. *See State v. National Advertising Co.*, Me., 387 A.2d 745 (1978).

■ The referee found that Hardy had built the firewall in a workmanlike manner and in compliance with Marine Colloids' specifications. Rational support for that finding is provided by the testimony of engineer Paul Atwood. Hence, under the general rule discussed above, Hardy could not be held liable to Marine Colloids for damage caused by the firewall's collapse.

Some jurisdictions have established an exception to the general rule for situations in which the owner's specifications contain defects that should reasonably have been apparent to the contractor. When such a defect appears, the contractor is held to have a duty to warn the owner of the defect before proceeding with construction.

*E.g., Lewis v. Anchorage Asphalt Paving Co.*, 535 P.2d 1188 (Alaska 1975); *Co-operative Cold Storage Builders, Inc. v. Arcadia Foods, Inc.*, 291 So.2d 403 (La.App.1974); *Dobler v. Malloy*, 214 N.W.2d 510 (N.D. 1973). We need not now decide whether that exception to the general rule should be introduced into Maine law, for in any event Hardy satisfied any obligation he might have to warn Marine Colloids of defects in his specifications for the firewall.

■ The record supports the referee's finding that the wall designed by Marine Colloids and built by Hardy was adequately suited to its original intended use as an interior curtain firewall. Furthermore, the evidence in the case confirms the referee's finding that Hardy learned that the Pilot Plant would not be expanded only after he had completed the wall. Accordingly, the only "defect" that could have been perceived in Marine Colloids' plans—the fact that the firewall would be put to an inappropriate use as an exterior end wall—did not become apparent until Hardy had already finished construction. Marine Colloids did not need to be warned of this defect; the company's representative, William Greet, had become so concerned about the stability of the wall a few months after it was built that he requested Hardy to inspect it for soundness. Far from allaying Greet's fears, Hardy told Greet that he did not approve of the unsupported firewall "in any way, shape, or form." Under these circumstances, Marine Colloids had no reason to believe that the firewall would remain standing indefinitely without the expansion of the Pilot Plant or other efforts to buttress the wall. Having chosen to take no precautions to avert a known risk that the firewall might collapse, Marine Colloids cannot now seek to hold Hardy responsible for the materialization of that risk.

The entry must be:

Appeal denied.

Judgment of the Superior Court affirmed.

All concurring.