[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This action for damages arises out of a contractual arrangement between the plaintiff K. E. Cianci Construction Company ("Cianci Construction") and the defendant Griffin Construction Co., Inc. ("Griffin Construction") whereby the plaintiff as a subcontractor undertook to perform certain exterior site work and excavation for the construction of a truck terminal for New Penn Motor Express ("New Penn") in Southington. Kenneth C. Cianci ("Cianci") is the president and owner of Cianci Construction. Cianci Construction maintains that it is entitled to damages for the unpaid balance on the written contract as well as for certain extras.
The first count of the complaint[1] as amended which is in three counts alleges the following: first, on or after May 1, 1987, Cianci Construction, as a subcontractor, entered into an agreement with Griffin Construction, as the contractor, pursuant to which Cianci Construction agreed to perform certain exterior site and excavation work necessary in connection with the construction of the New Penn truck terminal for which Griffin Construction agreed to pay Griffin Construction the contract price of $511,000.00. This contract was amended in July 1987[2] by a provision substituting eight inches of processed gravel in place of eight inch bank run gravel under all bituminous concrete surfaces and the contract amount was increased to $526,750.00. The plaintiff next alleges that it undertook and completed its performance in compliance with its agreement with Griffin construction except for certain portions of the contract from which it was "either excused or prevented from performing." Cianci Construction further alleges that there is an outstanding balance of $35,750.00 due it from Griffin Construction which, despite demand, the latter has refused to pay and is, therefore, CT Page 1462 in breach of its agreement.
As to the first count the defendant admits the initial allegation to the extent that it alleges a contract was entered into between the parties on or after May 1, 1987 which was later amended sometime in July 1987 and, in doing so, alleges that the terms of the contract and Cianci Construction's obligation under it are fully set out in the written contract of July 1987. The defendant denies the remainder of the allegations in the first count.
In the second count, which is for extras, the plaintiff repeats its allegations of the contractual arrangement between the parties as well as its subsequent completion in accordance with its subcontract agreement except for the portions of which it was "either excused or prevented from performing." It goes on to allege that in addition to performing under the subcontract, Cianci Construction later agreed to supply extra and additional labor, materials and services on the New Penn project, not ordered by its subcontract agreement and/or for which Griffin Construction agreed to pay it. Although it had satisfactorily performed all of the "agreed-upon extras and additional labor, materials and services" for which the plaintiff alleges Griffin Construction owes it the amount of $87,017.15, the defendant has failed, despite demand, to pay that sum and has therefore breached its agreement with the plaintiff concerning such "extra and additional labor, materials and services."
As to the allegations of the second count the defendant repeats its answer to those allegations incorporated from the first count. With reference to the plaintiff's allegation of an agreement between them for Griffin Construction to pay the plaintiff for the extra and additional labor, materials and services on the New Penn project not covered by the written contract agreement, the defendant admits that the plaintiff supplied and performed certain additional labor, materials and services that were not covered by the agreement, it denies the balance of those allegations. The defendant goes on essentially to deny all the remaining allegations of the second count which include the plaintiff's claim of satisfactory completion of such extras and additional work, the amount of $87,017.15 due therefor and that it is in breach of the alleged agreement to pay that amount for them.
The third count of the amended complaint sounds in quantum meruit. The plaintiff first alleges that at some time subsequent to May 1, 1987, it began furnishing labor, materials and related services necessary to perform certain site work, excavation and related work on the construction project known as the New Penn terminal. The plaintiff then alleges that it do so with the full CT Page 1463 knowledge of and/or at the request of the defendant and that the defendant was on notice that it expected to be paid the reasonable value of such items and that the defendant expected or reasonably should have expected to pay for them. It further alleges that the reasonable value of these materials, labor and related services so furnished to Griffin Construction is $625,267.15 of which Griffin Construction has paid $502,500.00, leaving a balance due Cianci Construction in the amount of $122,767.15.
In its answer to the third count, the defendant admits its first allegation. While it admits "that the plaintiff furnished labor, materials and related services with its knowledge," it denies that "all of said labor, materials and related services were furnished at its request" and although, the defendant admits that while "it had notice that the plaintiff expected to be paid reasonable value . . .," it denies that "it should have expected or reasonably should have expected to pay the plaintiff for same." (emphasis added) The defendant essentially denies the remaining allegations as to the amount claimed as being the reasonable value of these items as well as the amount claimed to be due the plaintiff. The defendant also filed two special defenses.[3]
As already indicated the plaintiff seeks money damages. It maintains that it is entitled to recover $122,767.15; it breaks this amount down to $37,750.00 as remaining due to it on the written contract and $87,015.15 as the amount due to it for the claimed extras. In addition, it seeks interest at the rate of ten percent per year under General Statutes 37-3a[4] in the event the court should award it less than $117,000.00. There it points to the fact that it filed an offer of judgment on November 20, 1989, wherein it offered to take judgment against the defendant in the amount of $117,000.00. The defendant did not accept that offer of judgment and in that connection it contends that if the court should award damages in excess of $117,000.00 it is then entitled to interest at a larger rate in accordance with General Statutes52-192a(b).[5] The defendant, on the other hand, concedes that it is indebted to the plaintiff but only in the amount of $17,908.50. Griffin Construction reaches this figure by deducting from the amounts claimed to be due by the plaintiff those amounts attributable to the plaintiff's defective work under the written contract as well as certain credits allegedly due to the defendant.
It should be useful at this juncture to set out certain facts to serve as background for the later analysis of specific issues involved in this case which will be supplemented as circumstances require. In the spring of 1987 Cianci Construction submitted a bid of $511,000.00 to Griffin Construction to become the subcontractor to do the work and supply the materials and labor on the New Penn trucking terminal project on Canal Street in CT Page 1464 Southington. Before submitting that bid Cianci had picked up the plans and specifications from New Penn's architect. These plans provided that "all construction to conform to CT. DOT (Connecticut Department of Transportation) Form 813."[6] Griffin Construction accepted this bid and Cianci Construction started work at the New Penn site although no written contract had yet been executed. In July 1987 Cianci Construction and Griffin Construction did execute a written contract in the amount of $516,750.00; the increase of $15,750.00 being due to a change in the earlier oral agreement from a base of eight inch bank run gravel to eight inches of process stone. This was the only change of the earlier agreement between the parties. This written subcontract provided that Cianci Construction was, inter alia, to furnish all materials, equipment and labor to construct and "in a good substantial, thorough and workmanlike manner" perform, in accordance with the plans and specifications the New Penn job including all exterior site work and excavation for the building which, in turn included site preparation, building excavation and backfill, sanitary and storm sewers, water mains, roads and parking as per plans and specifications, concrete pads, process parking area, concrete block and wall, landscaping and planting and the provision of eight inches of processed gravel in place of eight bank run gravel under all bituminous concrete surfaces. The contract through the plans and specifications also required that Cianci Construction construct the parking areas of the site with not only a base of eight inch process stone but also with a two inch binder course of asphalt on top of which in turn was to be placed a one and one-half inch finish course of asphalt. This contract also contained the following provision: "No extra work or changes under this contract will be recognized or paid for, unless agreed to in writing before the work is done or the changes made in which writing shall be specified in detail the extra work or changes desired, the price to be paid or the amount to be deducted, should said changes decrease the amount to be paid hereunder."[7]
From May 1987 through the latter part of November 1987, Cianci Construction worked at the New Penn site. During that period it submitted eight requisitions to Griffin Construction for payment under the written contract totalling $495,250.00. Each of these requisitions or invoices set out specifically the work performed and materials furnished by Cianci Construction. Griffin Construction, without raising any real question concerning any of these while Cianci Construction was on the job, paid each of these with the last payment being made on about February 26, 1988. Serious questions developed concerning the placement of the two inch binder course of asphalt on November 24, 1987 by Tilcon Tomasso on the parking area at this site. Tilcon Tomasso had been retained by Cianci Construction to place this course of asphalt. Griffin Construction maintains that the circumstances surrounding CT Page 1465 its placement and its later partial deterioration constituted Cianci Construction's "most egregious breach of the D.O.T. specifications" along with certain other contentions it makes. Thereafter, the asphalt pavement began to fail and it was breaking up and deteriorating in the late winter and early spring of 1988.[8] As a result Griffin Construction did not pay Cianci Construction the amount of $35,750.00 which the latter billed it for the placement of the two inch binder course. As to the final course of asphalt, Mr. Cianci, Mr. Carbone, Mr. Gerald Griffin and Mr. George Griffin met at the site in December 1987 concerning the asphalt already installed as well as installing the final course at that time. Cianci and Carbone recommended against installing the final course at that time although the Griffins wanted to have it done at that time. Given that time of the year, two small areas (about three feet by three feet) of cracks, that asphalt plants close from about about mid-December to spring, it was decided to wait until spring to install the final course. Gerald Griffin testified that it made sense to wait until spring. During the winter, the plaintiff, the defendant and New Penn were negotiating, inter alia, for payment of the plaintiff's work. The terminal was open and operating as a truck terminal. There is no evidence to prove that in the spring either the defendant (or New Penn) asked or demanded that the final course be installed or that the plaintiff was asked or demanded to repair or reinstall the paving it had done on November 24, 1987. Under the circumstances, the plaintiff cannot fairly be said to be at fault for not doing any such thing during the spring of 1988.
Cianci Construction nevertheless, claims that that amount is due it on the written contract because it substantially performed its contract with the defendant and because the deterioration of this pavement was not proximately caused by its work in laying the binder course. Cianci Construction did not place the one and a half inch final course of asphalt on the parking area and did furnish the landscaping agreed upon. It is therefore making no claim in this action under the written contract for either of these items and concedes that Griffin Construction is entitled to credits of $30,000.00 and $1,500.00 respectively for these two items.
It is important at this juncture to point out Griffin Construction does not claim that it does not owe Cianci Construction anything at all in this action for damages. It does admit that it owes $17,908.05 and arrives at this figure after it deducts from Cianci Construction's claims certain amounts for Cianci Construction's defective work and certain claimed credits due to it. Cianci Construction, on the other hand, claims it is owed $35,780.00 on the written contract and $87,017.15 for extras for a total of $122,767.15. CT Page 1466
At the trial several witnesses testified and about seventy exhibits were admitted into evidence. Among the witnesses who testified were Kenneth Cianci, president of the plaintiff, George Griffin and Gerald Griffin, the secretary and president respectively of the defendant, Michael Carbone, the sales manager of Tilcon Tomasso and James DeBisshop, the construction foreman for Griffin Construction on the New Penn project.
The trier of fact determines the credibility of witnesses and the weight to be accorded their testimony and where the evidence is conflicting, its probative force is for the trier of fact to decide. Robert Lawrence Associates, Inc. v. DelVecchio,178 Conn. 1, 14, 420 A.2d 1142 (1979); McNamee v. Woodbury Congregation of Jehovah's Witnesses, 194 Conn. 645, 648,484 A.2d 940 (1984); Steinman v. Maier, 179 Conn. 574, 576, 427 A.2d 838
(1988). It may also draw reasonable inferences from the evidence. In re Juvenile Appeal (82-AB), 188 Conn. 557, 561, 452 A.2d 113
(1982). The trier may believe all or part of the testimony of a witness. State v. Rothenberg, 195 Conn. 253, 257, 487 A.2d 545
(1985); Gutowski v. New Britain, 165 Conn. 50, 56, 327 A.2d 552
(1979); Rood v. Russo, 161 Conn. 1, 3, 285 A.2d 220 (1971). Moreover, the court is not bound by the uncontradicted testimony of any witness, Bieluch v. Bieluch, 199 Conn. 550, 555, 509 A.2d 8
(1986); Acheson v. White, 195 Conn. 211, 217, 487 A.2d 197 (1985), and, "evaluating such testimony, the trial court must assess the credibility of the testifying witness and consider the presence or absence of corroborating evidence." Bieluch v. Bieluch, supra 555-556.
Testimony that goes uncontradicted does not thereby become admitted and undisputed . . . nor does the strength of a witness' belief [in it] raise it to that level." Stanton v. Grigley,177 Conn. 558, 563, A.2d (1979). The interest of any witness may also be considered on the issue of credibility. Buonanno v. Cameron,131 Conn. 513, 515, 4, A.2d 107 (1945); Nesbit v. Crosby, 74 Conn. 554,564, 51 A. 550 (1902).
The plaintiff also produced as it expert witness, Robert Heller, a geotechnical engineer, of impressive credentials and a vast background of relevant experience and he was subjected to a searching examination by counsel for both parties. Expert testimony is to be considered, weighed and tested like any other testimony. State v. Kelly, 77 Conn. 266, 275, 58 A. 705 (1904); Tait and LaPlante, Connecticut Evidence (1988) 7.16.6. We note that while the credibility of an expert witness is a question for the trier of fact, "to qualify as credible testimony, the opinion of any expert must be `one which the rational mind would reasonably read upon established facts.' Stephanofsky v. Hill,136 Conn. 379, 384, 71 A.2d 560 (1950)"; Duley v. Plounde,170 Conn. 482, 487, A.2d (1976). Of course, the fact that a witness CT Page 1467 testifies as an expert does not compel the acceptance of his testimony as true." Nixon v. Gniazdowski, 145 Conn. 46, 48138 A.2d 796 (1958).
 I
We turn first to the plaintiff's claim that it is owed $35,750.00 on the written contract. The plaintiff there essentially argues that it has performed its written agreement in a workmanlike manner, and that the contract was substantially, if not completely, performed. Moreover, it also contends that the failure of the asphalt pavement at the New Penn site was not caused by it (or Tilcon Tomasso) but rather it was caused by the design plans and specifications with which it had to, and did, comply with on this project. It depends heavily on the testimony of Heller that such plans and specifications were the proximate cause of the pavement failure. The defendant, in resisting the plaintiff's claim here, argues that the plaintiff failed to comply with the subcontract's plans and specifications concerning the preparation of the subgrade,[9] subbase and asphalt pavement, and has not substantially performed its agreement. In addition, the defendant asserts that the plaintiff's failure to comply with the contractually specified plans and specifications precludes it from interposing as a defense that this pavement would have failed even had the contract plans and specifications been followed.
In arguing that the plaintiff did not perform according to the specifications of DOT Form 813 and thereby breached its written contract, the defendant refers to certain specifications and its claims of the factual predicate for such claims. In doing so, it appears to suggest that any non-conformance partakes of something akin to a "negligence per se" violation of a statute or properly promulgated regulation; no cognizable authority in this jurisdiction is offered by the defendant for that view. Cf. Civitello v. United Illuminating Co., 158 Conn. 600, 608,266 A.2d 382 (1969). It is interesting to point out that the defendant has not demonstrated that any of the claimed specifications of DOT Form 813 the plaintiff is alleged to have violated appear in any statute and, more significantly, do not appear as a regulation anywhere in the "Regulations of Connecticut State Agencies."
It is recognized, however, that a duty to use care may arise from a contractual relationship between the parties. Johnson v. Flammia, 169 Conn. 491, 496, 363 A.2d 1048 (1975); Urban v. Hartford Gas Co., 139 Conn. 301, 304, 93 A.2d 292 (1952). In such a case, the duty relates to the performance of the contract. See Scribner v. O'Brien, Inc., 169 Conn. 389, 401, 363 A.2d 160
(1975). A party may thus be liable in negligence for the breach of a duty which arises out of a contractual relationship. Johnson CT Page 1468 v. Flammia, supra; Lasso v. Ayotte, 155 Conn. 525, 529,235 A.2d 236 (1967). When Cianci Construction undertook to prepare the New Penn site with reference to the placement of the pavement involved, it was under a duty to exercise that degree of care which a skilled subcontractor of ordinary prudence would have exercised under the same or similar conditions specifically including conformance with DOT Form 813 as agreed to. See Johnson v. Flammia, supra Sasso v. Ayotte, supra 529. If it did not exercise such care with reference to any of those sections of DOT 813 claimed to have been breached Cianci Construction could be found negligent in the performance of its contractual duty to the defendant.
With reference to the preparation of the subgrade, the defendant points to 2.02[10] and 2.09. If refers first to subarticle 2.09.03 which provides in part:
 "2.09.03 — Construction Methods: All soft and yielding material and other portions of the subgrade which will not compact readily shall be removed and replaced with suitable material. . . The dry density after compaction shall be specified in Subarticle 2.02.02-6. . . ."
It then refers to subarticle 2.02.03-6 which provides in part:
 6 — Compaction: The entire area of each layer of the embankment and the subgrade in the excavated areas shall be uniformly compacted to at least the required minimum density by use of compaction equipment consisting of rollers, compactors or a combination thereof. . . . The dry density after compaction shall not be less than 95 percent of the dry density for that soil when tested in accordance with AASHTO T 180, Method D, except that the mold used in the test shall be 6.11 inches high. Correction for particles retained on the 2/4 inch sieve shall be as specified in AASHTO Method T-224."
and thereafter to subarticle 7 which provides in part:
 7 — Stability: If after full compliance with the requirements of these specifications with regard to excavation, placement and compaction density requirements, a stable embankment or subgrade has not been obtained, the Contractor shall proceed to perform such corrective work as is necessary to produce a stable subgrade. . ."
CT Page 1469
The defendant argues that it is undisputed that the plaintiff did not perform "any proper or industry approved compaction tests" to determine if the subgrade was at 95% dry density prior to installing the subbase or paving. It rejects what Cianci "merely testified" as to why he believed he obtained 95% dry density for the subgrade. It also attacks Heller's opinion which was in effect that the subgrade (and subbase) was at 95% density at the time of pavement on November 24, 1987. Two things deserve noting at this point. First, Mr. Cianci testified that the parking area at the New Penn trucking terminal which was to be paved with asphalt encompassed approximately 10,000 square yards. The trucking terminal building on this property, according to the plans, is about 270 feet long by about 50 feet wide and it is situated about 190 feet in from Canal Street from which the tractor trailers enter this terminal. Second, Mr. Cianci has been involved in the construction business since 1965 when he started as a laborer. Over the years he has done excavating work and worked on storm and sanitary sewers installation, parking lots, site work (has done this exclusively since 1981) and state highway crossings. He has done work of this nature for a number of municipalities and the state of Connecticut. He is not, however, a paving contractor as such, and has not contracted, before this contract, to pave a parking lot site for a trucking terminal. He has, however, prepared subgrades over his experience as well as subbases as well as being familiar with such things as compaction, dry density, stability and the like.
This branch of the case generated questions of credibility.[11]
The plaintiff insisted that the dry density after compaction of this subgrade was not less than 95% of dry density for that soil. Dry density said Heller, is the ratio of soil materials to the volume they occupy. Among Heller's expertise is the classification of soil materials; such classification is important because that knowledge yields data necessary as to the engineering use of soils in a given situation. Heller and his assistants visited the New Penn site on August 17, 1989 with their equipment, conducted a number of tests including those of soils, took a number of samples, caused certain laboratory tests to be done as well as making certain determinations at the site including the judgment that there was an artisian condition there. On August 17, 1989 the site was being used as a truck terminal by New Penn and had been for a considerable time from during the winter of 1988 and thereafter. There is no evidence that the final binder course of asphalt was ever installed by the plaintiff or that the final binder course has been installed by anyone. Prior to going to these premises Heller had, inter alia, examined the plans and specifications from which the plaintiff had worked, certain pre-construction boring tests done in March 1987 that implicated soils at this site and had examined relevant weather records for November 1987. CT Page 1470
Heller is quite familiar with DOT Form 813. He testified, and the court credits, that he had interpreted the data as whole to show that as to the paved area the compaction was adequate for both the subgrade and the subbase and met the DOT Form 813 requirement of 95% as of November 24, 1987. In doing so he acknowledged that what data there was that was short of 95% would not change his opinion of compaction to meet DOT Form 813. He rendered his opinion of such conforming despite some disagreement with Mr. Cianci on certain of Cianci's testimony.
The defendant also claims referring to DOT 2.02.01-7 that the plaintiff failed to obtain a "stable" subgrade. It refers to testimony of Mr. Cianci "with respect to the area of west of the terminal" where it is claimed he said they "never got to the point where it was stabilized." It is true that some water was encountered just west of the terminal when excavation for that structure was in progress. This was encountered early in the project in connection with water draining into the footings for that building and the plaintiff immediately brought to the attention of the defendant's superintendent, DeBischoff, who was at the site all day every day from the start of the project in the spring of 1987 through December 1987. The plaintiff recommended to him that stone be put in the footings but that was not done. Rather drains were installed. The point is that the evidence does not disclose that the area west of the terminal, which building itself encompasses 14,850 square feet, was never stabilized. An examination of the plans, indicating the location of the terminal simply does not justify a suggestion, let alone a reasonable inference, that the approximate one hundred and twenty feet west of the terminal had the stabilization problem implied by the defendant. True, Mr. Cianci's testimony could be believed but only as to a small portion of this particular area. The defendant also argues that Mr. Cianci's testimony that "the" area to the south of the terminal shows movement when vehicles passed it is further evidence of an "unstable subgrade." The court cannot accept this latter argument implying that the whole area or even an appreciable part of this area was of "unstable subgrade." The credible evidence cannot justify a finding of an "unstable subgrade" for the approximate 10,000 square yards of parking area (or any appreciable portion of it) of this trucking terminal which was paved by the installation on November 24, 1987 of about 1450 tons of binder course pavement.
Going on, the defendant contends that the moisture was such on November 24, 1987 that the asphalt pavement should not have been installed on the New Penn site. In doing so, it points to DOT Form 813 subarticle 4.06.03(8) entitled "Placement of Mixture" and which states that "Prior to the placement of the bituminous mixture . . . the mixture shall not be placed when weather CT Page 1471 conditions of fog or rain prevail nor when the pavements show sign of any moisture . . ." and claims that the plaintiff violated this specification. The court does not agree because the credible evidence is otherwise. The weather on November 12, 1987 and prior thereto was developed at trial. Mr. Cianci as well as the paving contractor, Tilcon Tomasso, decided that it was proper to pave on that day. Michael Carbone, who is the sales manager for Tilcon Tomasso, testified that his company performs between 300 and 400 paving projects each year. His paving crew had come on the New Penn site on November 17, 1987 to do fine grading and rolling preparatory to installing the asphalt pavement. They were on the site for three days doing so before actually laying the pavement on November 24th. Carbone received no feedback from his paving foreman on the New Penn site that that site was unacceptable for paving or that the pavement should not be laid on November 24th. Carbone also did not get any feedback in connection with its actual installation on that date from his foreman. He would have expected to be notified if circumstances indicated the contrary. Moreover, Heller, during cross-examination concerning this subarticle's ". . . . signs of any moisture" language said engineers interpret it differently. Heller also said that he interpreted that as he saw it used in practice. In his experience which included paving from supermarket parking lots to expressways he has seen paving when it was misty or when there was a damp surface. Essentially, he said it was a judgment call to be made in the field, not on laboratory observations. There was no violation of this subarticle as claimed.
In addition, the defendant claims that the plaintiff, notwithstanding its contractual obligation to install a subbase of eight inches of process gravel "only installed six inches." It argues that this is firmly established by Heller, who testified that, based on the seven test pits he dug at various locations throughout the parking area, the average depth of the subbase was six inches. The defendant also refers to the stipulation at trial that one sentence in a letter, dated July 12, 1988, by the plaintiff to the defendant stated that the plaintiff's records indicated that it was 428 tons short of process aggregate stone to yield an eight inch subbase of that aggregate. This letter, which itself was not in evidence, was written during the course of settlement negotiations between the parties. Mr. Cianci maintained, as he testified, that he had installed eight inches of this material before the November 1987 paving based on stakes[12]
he had placed at a number of places at this site. His records demonstrated that in excess of 5000 tons of process aggregate stone was actually installed in the subbase. He also said that in March 1988 he returned to the site and a hole he dug indicated eight inches of process aggregate at that location. There is no evidence, that given the approximate 10,000 square yards of this site to be paved upon an eight inch process aggregate stone CT Page 1472 subbase of the impact over this area of the alleged shortfall of 428 tons of this material upon the failure of the pavement.
In any event, even assuming arguendo there was a 428 ton shortfall, that does not necessarily mean that the plaintiff did not substantially fulfill its contractual obligation with the defendant in that regard. The question then arises, given the resolution of the other claims of the defendant discussed above, does this shortfall preclude the defendant from recovery of the $37,500.00 it claims is still due it on the written contract with the defendant? "Whether a building contract has been substantially performed is ordinarily a question of fact for the trier to determine. Edens v. Kole Construction Co., 188 Conn. 489,494, 450 A.2d 1161 (1982); Randolph Construction Co. v. Kings East Corporation, 168 Conn. 269, 274, 334 A.2d 464 (1973); Chinigo v. Ehrenberg, 112 Conn. 381, 384, 152 A.2d 305 (1930); "Nor'easter" Group Inc. v. Colossale Concrete, Inc., 207 Conn. 468,472-473, A.2d (1988). What constitutes "substantial performance" is "always a question of fact, a matter of degree, a question that must be determined relatively to all the other complex factors that exist in every instance." 3A Corbin on Contracts, (1960) 704, p. 318; see Vincenzi v. Cerro, 186 Conn. 612,615-617, A.2d (1982). Its object is to prevent forfeiture of work labor and materials supplied by the substantially performing party. Bron-Marx Associates Ltd. v. Emigrant Savings Bank,703 F.2d 1361, 1367 (11th Cir. 1983). The intent of this doctrine, it has been said ". . . is equitable, to prevent unjust enrichment or the inequity of one party's getting the benefit of performance, albeit not strictly in accord with the contract's terms, with no obligation on return. The court will allow recovery under the contract, where a party in good faith has substantially performed its obligation. Brown-Marx Associates, Ltd. v. Emigrant Savings Bank, supra, see generally 3A Corbin on Contracts 700-701, Vincezno v. Cerro, supra, 615-616 ("contemporary view, [is] that even a conscious and intentional departure from the contract specifications will not necessarily defect recovery.")
In this case, the defendant (and New Penn) did not ultimately obtain the paving contracted for as to the binder course.[13] The paved area, on the credible evidence, was, however, being used by New Penn for its trucking terminal in 1988 when Mr. Cianci visited the site and also when Heller was on the site in 1989 for his work. Mr. Cianci said that when he was there in March 1988 there were about twenty-five tractor trailers there similar to the ones he sees on I-91. There is no evidence that the New Penn site has been repaved or that any paving has been done there since the plaintiff was on that job in 1988. It is evident, on the other hand, that the plaintiff, if not permitted to invoke the doctrine of substantial performance will suffer forfeiture of the cost of the labor and materials expended on CT Page 1473 laying the binder course. The plaintiff acted in good faith here. It is also appropriate to consider the degree to which the defendant can be adequately compensated for that part of the benefit of which he will be deprived. But it should be noted that the defendant has not offered any evidence demonstrating that it has been put to any additional expense because of the paving problem and whatever evidence there is in this case shows that New Penn is using the site as a trucking terminal and specifically including the paved area. The defendant claims that it is entitled to a credit of $35,041.65 against the plaintiff because of the paving claim.[14] This is the amount that Tilcon Tomasso's representative, Carbone said it would cost for it to pave the 10,157 square yards of the surface course at the New Penn site. Assuming the defendant was entitled to a credit, it certainly would not, under the circumstances, be entitled to the full amount claimed. The court cannot speculate as to what portion, if any, that the defendant would be entitled to. There is no credible evidence upon which to base such a finding and that is the defendant's burden. Particularly, two matters are noted here: Heller's observation of the failure of a "substantial portion of the paving done furnishes no reasonable basis for extrapolating "substantial portion" into a fair dollar credit. Gerald Griffin's testimony that 75% of the payment is "shot" is not deemed credible.
Under all the circumstances the court determines that the plaintiff fairly complied with the plans and specifications it was given and is entitled to invoke the doctrine of substantial performance and it concludes that it has substantially performed its written contract and is entitled to recover the $37,500.00 claimed on the first count.
In finding that the plaintiff substantially performed which indicates that he did so in a workmanlike manner, the evidence disclosed that his only "defective" work did not become apparent until after it finished its paving the binder course. That "defective" work was caused by the inadequate plans and specifications as Heller testified. Courts have pointed out that such a contractor should not be held liable to his principal in damages or losses resulting from defective plans or specifications supplied by his principal. See Southern New England Contracting Co. v. State, 165 Conn. 644, A.2d (1974) and cases there cited, Marine Colloids Inc. v. M.D. Hardy, Inc., 433 A.2d 402, 406 (ME 1981). The defendant cites to an Illinois Appellate Court case which states: "A negligent design by an architect or engineer cannot be interposed as a defense by a contractor who has failed to comply with the plans and specifications provided him. . . . The contractor has a duty to carry out the construction in accordance with the plans and specifications agreed upon and can only depart from them at its peril." W. H. Lyman Construction Co. CT Page 1474 (1985). The other case cited by the defendant is Al Johnson Construction Co. v. United States, 854 F.2d 467 (Fed Ct 1988). In that construction contract case the court said: ". . . it is reasonable to throw the burden on the contractor to prove his nonconformance to specifications had no logical relationship to the failure of the [pavement] and that that burden is a "difficult burden." Al Johnson Construction Co. v. United States, supra 470. The plaintiff has clearly met this "difficult" burden.
In addition, the plaintiff, based on Heller's testimony about the cause of the pavement failure, is also entitled to recover the $37,500.00 claimed under the written contract. Heller has had very significant training and experience in the particular area about which he testified.[15] As to the plans and specifications for the New Penn site, Heller testified credibly that insofar as the failure of the pavement laid on November 24, 1987 was concerned, they were "grossly inadequate," "not even close" for the soils, soil and site conditions including environmental circumstances at the New Penn site which the plaintiff paved. He particularly stressed the thickness of the subbase and the subgrade provided for in those plans and specifications. It was Heller's opinion that the deterioration or breakup of the pavement installed by the plaintiff would have occurred even if the plaintiff had precisely followed the plans and specifications. This opinion specifically included the installation of eight inches of process aggregate stone and three and a half inches of asphalt required by the plans and specifications for both courses of asphalt. Thus he opined that the cause of the failure of the pavement, as it in fact did, was the inadequate plans and specifications. Using his expertise, he reached this opinion about the cause of the pavement failure after site tests and samples, both on the site and in laboratory tests. The appearance and nature of this failure was manifested to him by the "alligator cracks" he observed and examined; such breakup was consistent with his theory that the failure was caused by the soils, conditions, environment and the like. Among other things he found a high water table at this site, about three to five feet under the surface, a "high" silt content in the soil, a concrete-like impaction of the subgrade and that the onsite soils were frost susceptible. These circumstances were such that from the prevailing climate in this area that, in such frost susceptible soil, he opined, water was held subsurface forming "ice lenses" from that water which upon thawing moves up to the surface resulting in "frost heaves" which causes the pavement to stretch and crack. The water which comes up in these freeze-thaw cycles becomes quite noticeable when pressure from such things as vehicles is exerted from the surface. The weather on November 24, 1987, in Heller's opinion, had nothing to do with the condition, particularly the "alligator cracks," that he observed, the appearance and nature of which he said was consistent with his CT Page 1475 opinion of the cause of the pavement failure. Heller maintained that the "failed" portion of the pavement should be replaced but that the problems he found on the site would still continue unless the plans and specifications are redesigned. He also told what the proper specifications should be if he were designing it, including specifically the depth of the subbase and the subgrade both of which would be appreciably deeper than under the present plans and specifications.
The defendant argues that it is speculation on Heller's part to predict what would have happened had the plaintiff precisely satisfied the present plans and specifications. Here it asserts that, after all, Heller was not there at the site until August 1989. The court has just discussed at length its credibility of Heller's testimony and particularly causation. The court is aware that testimony on the issue of causation should not be considered when it rests on speculation. Swartz v. General Motors Corp.,375 Mass. 628, 632 N.E.2d (1978). In addition, the court is also ware that an expert opinion must be disregarded where it amounts to no more than mere speculation or a guess from subordinate facts that do not give adequate support to the conclusion reached. Nass v. Dunsbury, 327 Mass. 396, 401 N.E.2d (1951). An expert opinion, however, based upon facts in evidence affords sufficient proof of causation. Carey v. General Motors Corp., 377 Mass. 736, 740, N.E.2d (1979). Expert opinion, inter alia to be considered, must not only be based on facts and/or inferences from facts properly in evidence, but also on reasonable probability and not just a possibility. See Boland v. Vanderbilt, 140 Conn. 520, Swartz v. General Motors Corp., 375 Mass. 628, 632 N.E.2d (1978). Heller's opinion testimony of causation of the pavement failure spoke in terms of reasonable probability and was based on his expertise and on facts in evidence and/or reasonable inferences thereupon. It was not based on speculation. The court credits Heller's testimony and concludes that the proximate cause of the failure and breakup of the asphalt pavement was not due to any action or inaction of the plaintiff but because of the inadequacy of the plans and specifications for this site as set out by Heller.
The court's conclusion that the pavement failure that occurred would have occurred even if the plaintiff had precisely followed the plans and specifications makes it unnecessary to discuss the defendant's claim in its post trial brief that it is entitled to a $90,000.00 "additional credit against the contract balance" the plaintiff claims for "pavement failure." The defendant claimed this $90,000.00 credit by taking 75% of $120,000.00 which was the amount projected for "Roads and Parking" under the contract and applying to it George Griffin's testimony that "75%" of the asphalt pavement laid down on November 24, 1987 was "shot." CT Page 1476
 II
Next the court turns to the plaintiff's claim for extras,[17]
based on change orders, which totals $87,017.15. The defendant had set up a special defense alleging that to the extent that the owner of the New Penn Express Truck Terminal has not paid the defendant for work performed by Cianci then the defendant is not obligated to pay the plaintiff. Two observations: First, there is no evidence to show the extent to which New Penn did not pay the defendant for any such work by the plaintiff that avails the defendant here. There is, however, evidence that New Penn did pay the defendant an undisclosed sum as the result of an arbitration proceeding between New Penn and the defendant. Second, at the trial Gerald Griffin, the president of the defendant, on cross examination, testified that he was familiar with the change orders claimed by the plaintiff, that he had always considered them legitimate, that the work done as claimed by the change orders had all been done by December 1, 1987 and that they should be paid minus some credits[16] due Griffin Construction. Interestingly, the defendant's post-trial argument as well as its brief acknowledged sub silentio the significance of this testimony of Gerald Griffin. In addition, the defendant's second special defense has not been proven.
The term "extras" as used in connection with the construction contracts, can be said to mean work and materials arising outside of and entirely independent of the contract; that is, something not required in its performance, not contemplated by the parties and not controlled by the contract. See Bolster Co. v. Boespfberg Construction Co., 167 Cal.App.2d 143, 334 P.2d 247, 252 (1959); Sweetmen Co. Inc. v. State, 293 N.W.2d 489, 460 (S.D. 1980); Trinity Building Inc. v. Schaff, 199 N.W.2d 924, 928 (N.D. 1972); Carolina Mechanical Contractors, Inc. v. Yeargin, 198 S.E.2d 224,229 (S.C. 1973); 17 C.J.S. Contracts 371(6), p. 410. The party claiming damages for extras must demonstrate that it is so entitled. See Edens Kone Construction Co., supra 500-501. Moreover, "provisions in a written contract requiring written orders for change in the work or for extra work may be waived by the parties so that the [contractor] becomes liable [to his subcontractor] for damages or extras done by his oral direction." VonLangendorff v. Riordan, 147 Conn. 514, 528, A.2d (1960); Wexler Construction Co. v. Housing Authority, 144 Conn. 187, 193,128 A.2d 540 (1956); T. Lippia Son, Inc. v. Jorson, 32 Conn. Sup. 529,531-53, A.2d (1975) or by acts or conduct. D.K. Meyer Corp. v. Bevco, Inc., 292 N.W.2d 773, 775 (Neb. 1980), Annotation 2 A.L.R. 620.
Before going into the claim for extras, specifically certain comments may be made. The written contract provided that change orders be approved in writing by the owner and the architect after CT Page 1477 submission for such authority by the defendant. The defendant, while admitting the work claimed as extras was done by the plaintiff, never obtained the written approval of the owner and the architect on any of the change orders. George Griffin testified, however, that the defendant was paid by New Penn for some of the change orders but he did not know which ones were so paid although he also said that he was "totally involved" with the change order. Actually the defendant, nevertheless, paid the plaintiff the sum of $43,000.00 as payment in full of a plaintiff's invoice for certain extras submitted on October 30, 1987. Accordingly, there was a waiver of the contract requirement.
While the defendant claims certain credits against the extras, there is no credible evidence that the defendant ever did or reasonably could understand that any of the work and materials claimed as extras were intended to be furnished gratuitously. This court finds that the amount claimed as extras were for work and materials furnished by the plaintiff to the defendant for the New Penn job, that this was done in a workmanlike manner by the plaintiff and that the charges were fair and reasonable. See Jacobson Electric Co. v. Rome Fastener Corporation, 156 Conn. 55.
The question remains whether the defendant is entitled to any of the credits it claims against this sum of $87,017.15. The plaintiff admits that the defendant is entitled to this claimed credit of $337.00 for blasting damage. The defendant also claims that it is entitled to a $3,500.00 credit on the change order concerning fuel tank installation as an overcharge; the plaintiff disputes this claim. This claim arises not strictly out of the defendant's responsibility for the work which was the subject of the change order but for a $3,500.00 portion of the total amount of $20,028.27. Apparently in February or March 1988, some discussions took place between the plaintiff, the defendant and one Timothy Hoffman, who was New Penn's representative during the work the plaintiff performed at this site. These discussions looked to compromise and or settlement, at least, of the plaintiff's "fuel tank" invoice for payment of $20,028.27. At the trial a change order form on the "fuel tank" portion was admitted as part of an exhibit; this change order form, as all others, was not signed by the architect and the owner. On the change order form which the plaintiff had not seen until the trial there was the hand written statement on it which said: "Reduce this order by $3,500.00." This handwriting, the defendant claims was the amount by which Mr. Cianci agreed to reduce the amount requested in the face of Hoffman's claim that the charges was "too high" by this amount. Mr. Cianci, George Griffin, Gerald Griffin and Hoffman were at this meeting. Mr. Cianci's position was that he offered to go along with the $3,500.00 reduction as an incentive to get some money paid and not because his bill was $3,500.00 "too CT Page 1478 high" as argued. In any event this invoice including the $3,500.00 was not paid, there was no acceptance of his proposal and, thus, the plaintiff opposes the "credit" of $3,500.00. The court agrees with the plaintiff. An offer may be revoked at any time prior to acceptance. Lloyd Elliot, Inc. v. Parks,112 Conn. 504, 152 A. 825 (1981); see 6 Corbin Contracts 1270 (1962). In any event, the bringing of the present action operated to withdraw the plaintiff's offer. See Railroad Salvage of Conn., Inc. v. Eazor Express, Inc., 29 Conn. Sup. 354, 358, 287 A.2d 745
(1971). The court concludes that the defendant is not entitled to this alleged credit of $3,500.00.
In addition, the defendant claims that it also is entitled to a credit of $5,980.00 for rock excavation. The plaintiff admits that in its letter of January 28, 1988[18] to the defendant it proposed a credit in this amount. The evidence on this aspect is conflicting. Mr. Cianci first said that prior to starting the New Penn job the plaintiff offered the defendant a credit of $5.00 per cubic yard on excavated rock by reducing the unit price for the removal of such rock from $30.00 per cubic yard to $25.00 per cubic yard. With reference to Mr. Cianci's memorandum of December 15, 1988, which stated the amounts claimed to be due for the extras as well as the contract balance, he said, that that exhibit did not "consider" the now-admitted blasting credit of $337.00 or the now-disputed $5,980.00 "credit." He also said that in January 1988 "we" talked to the defendant and said that it would get this credit if "we" got paid. The defendant is entitled to have this amount of $5,980.00 credited against its balance it owes the plaintiff.
In sum, as to the plaintiff's claim for extras in the amount of $87,017.15, the court concludes that the plaintiff has proven that he is entitled to recover $80,700.15. This latter amount is arrived at by giving the defendant credits of $5,980.00 and $337.00 which total $6,317.00 against the $87,017.15.
 III
The court has determined that the plaintiff is entitled to recover of the defendant $37,500.00 as to the written contract under the first count and $80,017.15 for the extras under the second count for a total of $117,517.15.
This action was instituted in November 1988. In November 1989, the plaintiff filed an "Offer of Judgment," pursuant to General Statutes 52-192a[19] and Practice Book 346 et seq. offering to take judgment against the defendant in the amount of one hundred and seventeen thousand ($117,000.00) dollars and to stipulate to a judgment for that sum. This statute provides that if "the `offer of judgment' is not accepted [by the defendant] CT Page 1479 within thirty days [of its filing], the `offer of judgment' shall be considered rejected. . . ." The defendant did not accept the plaintiff's offer of judgment within the thirty day period. The statute further provides that "after trial the court shall examine the record to determine whether the plaintiff made an `offer of judgment' which the defendant failed to accept" and "if the court ascertains from the record that the plaintiff has recovered an amount equal to or greater than the amount stated in his `offer of judgment,' the court shall add to the amount so recovered twelve per cent annual interest on said amount. . . ." The plaintiff has recovered an amount greater than the amount stated in its offer of judgment. The plaintiff is entitled to recover interest at that rate from the date of the filing of its complaint because its offer of judgment was filed ". . . not later than eighteen months from the filing of [its] complaint." General Statutes52-192a(b). The plaintiff is therefore entitled to twelve per cent annual interest on $117,517.15 from the date the complaint was filed with the court and that date was December 12, 1988.
Therefore the interest awarded on the sum adjudged to be due and owing to the plaintiff from the defendant on $117,517.15 is the following:
 Balance due to the plaintiff $117,517.15 12% interest from December 12, 1988 to December 31, 1988 $ 720.29 12% interest from January 1, 1989 to December 31, 1989 14,102.05 12% interest from January 1, 1990, to December 31, 1990 14,102.05 12% interest from January 1, 1991 to February 4, 1991 @ $37.91 per diem 1,326.81 _________ $30,251.20 30,251.20 ___________ $147,768.35
Accordingly, judgment is entered for the plaintiff against the defendant on the first and second counts of the complaint in the sum of $147,768.35 and the third count is dismissed.
ARTHUR H. HEALEY STATE TRIAL REFEREE
FOOTNOTES